Argued December 5, decided Decmber 31, 1912.

## VANYI v. PORTLAND FLOURING MILLS CO.*

(128 Pac. 830.)

**Master and Servant—Injuries to Servant—Nonsuit—Evidence.**

1. Where, in an employee's action for injuries from a motor falling on him, due to the breaking of the chain negligently used to support the head block of the block and tackle used in hoisting it, there was evidence tending to identify such chain as part of a longer chain which, after being used for a similar purpose a few days before, was discovered to have a broken link, and it appeared that the attention of defendant's foreman was called to such defect, a motion for a nonsuit was properly denied, though proof of the identity of the chains was not conclusive; a nonsuit being improper where there is any evidence, however slight, tending to establish plaintiff's right to recover under his complaint.

---

*For different forms of statement of the general rule with respect to the master's duty as to places and appliances furnished to servant, see note in 6 L. R. A. (N. S.) 602.

As to duty of master to inspect tools or implements furnished servant, see note in 1 L. R. A. (N. S.) 944.

On the question of a servant's assumption of risk of dangers created by the master's negligence, see notes in 4 L. R. A. (N. S.) 848, and 28 L. R. A. (N. S.) 1215.                                    REPORTER.

**Master and Servant—Duty of Master—Safe Appliances.**

2. Where a master's agent knew one link of a chain to have been broken from its use in hoisting a heavy motor, an especially strong duty rested upon the master to make a thorough examination for concealed defects before permitting any part of the chain to be used by employees for a like purpose.

**Master and Servant—Duty of Master—Safe Place to Work.**

3. It is the master's duty to furnish his servants with reasonably safe appliances with which to work, and to use ordinary care to keep them in a reasonably safe condition, commensurate with their intended use, and he is liable for the negligent performance of this duty, whether he undertakes to perform it himself or entrusts it to another.

**Master and Servant—Injury to Servant—Assumption of Risk.**

4. An employee will be presumed to have assumed the ordinary risks connected with his employment, but not such as the master might have avoided by ordinary care.

**Master and Servant—Injury to Servant—Proof—Negligence.**

5. The plaintiff, in an action against his employer for injuries, is entitled to recover where his evidence, though circumstantial only, raises a fair presumption of defendant's negligence and resulting injury to plaintiff, and defendant's evidence fails to rebut this presumption; it not being essential that evidence of negligence be direct and positive.

**Master and Servant—Injury to Servant—Safe Appliances.**

6. Where a master delegates to a foreman the duty of attaching the head block of a block and tackle to be used by an employee in moving heavy machinery, he is liable for injuries to the latter from a fall of machinery due to the foreman's use in attaching the block of a defective chain with knowledge of the defect.

**Appeal and Error—Review of Nonsuit—Cure by Subsequent Evidence.**

7. The denial of a motion for a nonsuit will not be disturbed, if the proof wanting when plaintiff rests is supplied by subsequent evidence.

From Multnomah:    William N. Gatens, Judge.

Statement by Mr. Justice Bean.

This is an action by Louis Vanyi against the Portland Flouring Mills Company, a corporation, to recover

for personal injuries. The cause was tried before a jury. A verdict was rendered in favor of plaintiff, and a judgment entered thereon, from which defendant appeals. On March 28, 1910, plaintiff, with R. M. Austin, J. W. Bennett, and James S. Church, was engaged in hoising a motor in defendant's flouring mill, when the chain, which was wound around a timber and supporting the chain block and tackle used in hoisting the motor broke, and the block fell on plaintiff. Plaintiff alleges that the defendant was negligent, causing the injury, in hooking the chain block into only one of the two loops of the chain; that the chain, by reason of its age, condition, and previous use, and by reason of being so hooked, was not sufficient to hold the weight of the motor or dynamo and chain block, and was too weak and insecure to make safe the method, means, and appliances by which the chain block was to be held in place while raising the motor; that plaintiff, being above the third floor, was where he could not see how the chain block was hooked, and had no knowledge of the defective fastening, or the inefficiency of the chain, which plaintiff alleges was not reasonably safe. The estimated weight of the motor was about five tons. This machine was on the first floor of the mill, and, in order to raise it upon a platform made for that purpose, the men made an aperture in the second and third floors of the mill, and placed the large timber across the opening in the third floor to support the chain. Then, with a small wooden block and tackle, they raised a large iron chain block weighing about 300 pounds, to the under side of the third floor, and Church, the man in charge of the work, reached down through that floor and hooked the block into one strand of the chain. Vanyi carried the chain to the third floor, and was there when the block was hooked to the same, but could not see how it was fastened. Vanyi and Church then went down to the second floor. The lower block was fastened to the

motor, the chains connecting the two blocks extending through the opening in the second floor. The four men on that floor commenced to pull on the end of the fall chain to raise the motor, when a piece of flange on one of the pulleys of the upper chain block broke, and Austin stood upon some machinery near the head block, to guide the chain in the pulley, leaving the three men to pull on the fall chain. In order to properly get hold of the chain, plaintiff seated himself on the floor. When the men pulled two or three times on the tickle, without lifting or budging the motor, the chain supporting the upper block broke, and the block fell, striking Church a light blow, then hitting plaintiff and injuring him.

Plaintiff had been employed by defendant for about five years as a miller. Shortly prior to the injury defendant's mill was partially burned, and Vanyi, plaintiff, was sent to Tacoma, Washington, to work for defendant in its mill there. Later he was called back to Portland, and assigned duties as a laborer, to aid in remodeling and rehabilitating the company's mill, which involved the lifting of the motor, as well as other machinery. Vanyi had had no experience as a mechanic, and was not acquainted with the tensile strength of chains or mechanical apparatus. The chain blocks consisted of two pieces of iron and carried various pulleys, around which passed a chain. The upper chain block is called the head block, and the lower, the foot block. There is a hook on the upper side of the head block and one on the lower side of the foot block. The sling chain had been a part of a 30-foot chain, which had been used, prior to the time of the injury, to raise the motor from the basement, where it had fallen at the time of the fire. The motor had been sent to a shop on board a car for repair, and returned to the mill in the same manner. It was rolled on skids from the car to the first floor of the mill. When the motor was first raised, it was so imbedded in the

debris that two attempts were made before success was attained. This subjected the sling chain to a terrific strain. Afterwards the 30-foot chain was cut into three lengths of about 10 feet each, and hooks put on the ends. These short chains were used in moving the machinery. About two or three days before the catastrophe complained of Mr. Church was superintending the raising of an electric motor smaller than the one referred to. When the large motor was first lifted, six or eight men pulled on the fall chain. Mr. Brown was the head miller, superintending the reconstruction of the mill.

C. J. Devero's testimony relating to the chain was about as follows:

"Q. Were you engaged at one time prior thereto in assisting in raising of any machinery, and, if so, state what machinery?

"A. Yes, sir; it was a motor.

"Q. What kind of a motor?

"A. I don't know the name of it. It was an electric motor, weighing probably in the neighborhood of three tons.

"Q. And, in a general way, what was it known as, what kind of a motor?

"A. A receiving motor.

"Q. Who was the boss in charge of the handling of that?

"A. Mr. Jim Church.

"Q. How was it raised, by what means?

"A. With block and tackle, chain block.

"Q. I will ask you if it had a sling chain, by which the block was attached.

"A. We were using a sling at the time; yes, sir.

"Q. About what kind of a chain was it?

"A. Just a common chain, I judge half inch to five-eighths chain, as near as I remember. I didn't pay particular attention to it.

"Q. I will ask you to look at this chain and state whether or not this is like the chain that was being used. I mean with reference to the thickness [referring to defendant's Exhibit A].

"A. Yes; the thickness and everything is very similar to the chain.

"Q. Now, how about the identification and the description of it now of the chain, does that resemble the chain you did use.

"A. Resembles the chain; yes, sir.

"Q. Who was in charge of the lifting of the motor at that time—what, if anything, did you say to Jim Church with reference to that particular chain or its use? (Objected to as immaterial, irrelevant, and incompetent. Objection overruled. Exception taken.)

"Q. Just tell the jury what you said to Jim Church at that time.

"A. We were raising it, and I noticed a defect in one of the links, and I said, 'There is a bad link in that chain there'; and I said, 'The best thing to do is to throw that in the river when the motor is landed.'" (Vanyi was not present when the defective link was mentioned.)

On cross-examination:

"Q. You spoke of a link that did not look good to you. I will ask you what you were using the chain for that day in your work?

"A. Using it in raising that motor.

"Q. In what way?

"A. I don't just remember what position we had it in. We had it with a good deal of strain on the motor.

"Q. For all you can now recall, this chain you saw the link in that day may have been fastened around the motor, might it not then, when they got hold of the motor to lift it?

"A. Yes, sir.

"Q. Or it may have been on the third floor when the hook of the iron chain was hooked in it?

"A. I do not know positively. I know we had the strain of the motor on it when I made the remark, is all I know about it.

"Q. Now, Mr. Devero, do you know where this chain came from you used that day, do you know anything about that?

"A. I don't.

"Q. Is there any way you know of that you can positively identify this chain you looked at as the chain you worked with that day?

"A. Well, from all general appearances it looks like the chain we had.

"Q. But do you know?

"A. Oh, there is a little fringe on the link I spoke of that I don't see there.

"Q. But would you be willing to testify positively that this chain here you looked at was the chain you called Church's attention to that day—can you answer to that positively?

"A. I would not swear to it positively; lots of times chains are alike. I say it looks like the chain we were using."

James S. Church testified, in substance, as follows:

"Q. You heard Mr. Devero's testimony here this morning, did you?

"A. Yes, sir.

"Q. Do you recall him calling your attention to a bad link in that chain?

"A. I do.

"Q. Do you recall anybody calling your attention to a bad link in that chain?

"A. Yes, we were hoisting the rolls into the mill, that part of the mill, and used this chain to put around the rolls.

"Q. What chain?

"A. Well, one of these parts. My attention was called to a broken link. I immediately took the chain off and threw it to one side and got a rope, and the chain was not used at all afterwards.

"Q. Did anybody, either Devero or anybody else, ever call your attention to any defective link in this chain here? (Referring to defendant's Exhibit A.)

"A. Not to my knowledge.

"Q. Did you ever notice anything wrong with this chain before the accident?

"A. I did not."

Mr. Church stated, in substance, that the other two chains were used in hauling the heavy machinery around

the mill, among which was a "shieve" ·weighing about two tons; that he could not say how long the chain had been in the possession of the company; that he had been with the company 27 years; that he made no examination of the chain either before or after it was cut up.

Mr. E. L. Taylor, a blacksmith, testified on behalf of defendant that he cut off two links of the chain (not the broken links), and found it was made of pretty good iron; that it looked like a good chain; that a chain may be overstrained in one lift.

Mr. G. B. Hegardt, a civil engineer, deposed that the chain appeared like a well-made chain; that such half-inch chain usually has a tensile strength of 16,000 pounds; and that the tensile strength wastes with time if it is used and overloaded.

T. White, a witness for defendant, testified to the effect that he was accustomed to building heavy mills; that, if the chain were constantly overloaded, it would make no visible marks, unless it had been subject to a great deal of vibration, which would granulate a chain and cause it to break; that the chain appeared to be all right, and would be safe to do good straight pulling of about 9,000 pounds; and that he would risk it on a four and one-half-ton pull.

Mr. A. C. McMicken, who had rewound the motor in 1908, testified for defendant that the motor weighed about 5,920 pounds. It appears that the chain was rusty.

AFFIRMED.

For appellant there was a brief over the names of *Messrs. Wilbur, Spencer & Dibble, Mr. Thomas Mannix,* and *Messrs. Williams, Wood & Linthicum,* with oral arguments by *Mr. Richard W. Montague* and *Mr. Mannix.*

For respondent there was a brief with oral arguments by *Mr. John F. Logan* and *Mr. Isham N. Smith.*

MR. JUSTICE BEAN delivered the opinion of the court.

1. At the close of plaintiff's evidence, defendant's counsel moved the court for a nonsuit, and here contend that there was no evidence tending to show a defect in the chain in question or any negligence of defendant. It is urged that the evidence of Devero, in identification of the chain in evidence as the one with a defective link, used at a time prior to the accident, fails to show that the chain used when Vanyi was hurt was defective. From the very nature of the evidence pertaining to the chain it was apparent that no one could positively identify the same. If any one should attempt to do so, under the circumstances, with no distinguishing mark on the chain, such testimony would be entitled to but little credit. Nevertheless, Devero's testimony tended to show that the chain in evidence was the one with a defective link, and that the attention of Church, defendant's agent, had been called to such defect. His evidence indicated a broken link in one part of the long chain, of which the chain used was formerly a part. Mr. Labatt, in his work on Master and Servant, Section 138, on the subject of *previous unsatisfactory operation of other instrumentalities of the same kind,* says:

"It seems impossible to argue with any show of reason that evidence of this sort is to be wholly rejected, and its competency has been more than once recognized. Manifestly, it is a reasonable inference that, where several out of a number of appliances modeled upon the same pattern or a closely similar pattern fail to perform their functions properly, the master is put upon inquiry as to the suitability of all the others."

It appears that the chain (Exhibit A) was introduced in evidence with scarcely any identification. Mr. Church did not explain what was done with the chain with the broken link, other than that it was thrown to one side. It does not appear that it was thrown into the river, or locked up, or that it was not left where the workmen

would naturally use it with the other two chains.   Mr. Labatt also says, in Section 22:

"It is not sufficient discharge of the master's duty that sufficient good material should be mingled with bad material in a common mass."

2.  Further, it was not purely a question of distinguishing one particular part of this chain from another that rendered Devero's evidence pertinent.   The proof fairly indicates that the 30-foot chain had been used in raising material of great weight, and had been subjected to severe strain, which was known to the agent of defendant in charge of this particular work.   After a defective or broken link had been noticed in one part of this chain, regardless of which part, and the company, by its employees, was arranging an appliance, namely, the chain and chain block, for the plaintiff and his associates to work with, and under which they were to stand, while working under these circumstances, it became a question for the jury to determine from all the evidence whether or not reasonable care was used in securing the head block with only one strand of the chain.   The obligation to make a thorough examination for concealed defects is especially strong where an appliance has been injured in parts open to view, and there is strong probability that the same accident may have weakened it in other places.   Labatt, Section 159, subd. "e."   The exercise of common prudence would require that, after a broken link had been observed in one part of the chain, the same should not be used and treated as a sound or perfect chain.   The jury was informed by the evidence that in raising the same motor on a previous occasion the head block had been hooked into two or three strands of the chain, thereby doubling or trebling its strength.   A master is chargeable with knowledge that organic matter will deteriorate; that certain material will not support more than a certain weight; that ropes and cables will

break if subjected to certain tensional strains; and that certain kinds of strains crystalize iron. Labatt, Master and Servant, Section 141; *Honifius* v. *Chambersburg Engineering Co.,* 196 Pa. 47 (46 Atl. 259); *Baker* v. *Allegheny Valley R. R. Co.,* 95 Pa. 211 (40 Am. Rep. 634); *Mulvey* v. *R. I. Locomotive Works,* 14 R. I. 204.

Under these conditions, the court could not say there was no evidence from which the jury could reasonably infer that the chain used at the time of the injury was, to the knowledge of defendant, defective and unsafe. The question was a proper one for submission to the jury. *Manning* v. *Portland Ship Building Co.,* 52 Or. 101, 103 (96 Pac. 545); Labatt, Master and Servant, Sections 835, 836. If there is any evidence, however slight, fairly susceptible of an inference or presumption tending to establish plaintiff's right to recover, under the theory of his complaint, a nonsuit should be denied. *Herbert* v. *Dufur,* 23 Or. 462 (32 Pac. 302).; *Chaperon* v. *Electric Co.,* 41 Or. 39, 45 (67 Pac. 928); *Jackson* v. *Sumpter Valley Ry. Co.,* 50 Or. 455 (93 Pac. 356); *Sullivan* v. *Wakefield,* 59 Or. 401 (117 Pac. 311); *Painton* v. *North. Central Ry. Co.,* 83 N. Y. 7.

3. It is the positive duty of a master to furnish his servants with reasonably safe machinery, instrumentalities, and appliances to work with, and by the use of ordinary care and diligence in making repairs to keep them in a reasonably safe condition, commensurate with the use for which they are designed, and he is liable for the negligent performance of this duty, whether he undertakes to perform it himself or intrusts it to another. *Allen* v. *Standard Box & Lumber Co.,* 53 Or. 10, 15 (96 Pac. 1109: 97 Pac. 555: 98 Pac. 509); 26 Cyc. 1136: 12 Am. & Eng. Enc. Law (2 ed.) 959.

4. The plaintiff is presumed to have assumed ordinary risks, but not such as defendant might have avoided by ordinary care. *Manning* v. *Portland Ship Building Co.,*

52 Or. 101, 103 (96 Pac. 545).   Mr. Justice MOORE, in
the case of *Patty* v. *Salem Flouring Mills Co.,* 53 Or.
350, 357 (98 Pac. 521), clearly expressed the rule gov-
erning a nonsuit, as follows:

"The degree of proof required of a plaintiff, who, in
order to obtain a favorable judgment, must sustain the
material issues involved, is generally classed as a prob-
ability.   If, when he rests his case, the facts which were
incumbent upon him to establish appear from the evi-
dence as merely possible, the court, upon motion of the
adverse party, should grant a judgment of nonsuit for
failure to prove a material issue.   When, however, after
the plaintiff rests his case, it appears from his evidence
that the facts devolving upon him to make manifest are
quite probable, his cause has passed the danger point of
a nonsuit."

We think the evidence in this case on the part of plain-
tiff clearly comes within the rule requiring the same to
be submitted to the jury.

5.  The plaintiff is not bound to prove more than enough
to raise a fair presumption of negligence on the part of
the defendant and of resulting injury to himself.   Hav-
ing done this, he is entitled to recover, unless the defend-
ant produces evidence sufficient to rebut this presump-
tion.   If the facts proved make it probable that the
defendant violated its duty, it is for the jury to decide
whether it did so or not.   It is well settled that evidence
of negligence need not be direct and positive.   The bur-
den of proof is satisfied by the production of circum-
stantial evidence.   Shearman & Red., Negligence (5 ed.)
Section 58; Labatt, Section 835.

6. The defendant, however, contends that Church,
while attaching the head block, and in failing to hook
the same to but one strand of the chain, was a fellow
servant of plaintiff, and was not the vice principal acting
for defendant, and that if he was negligent in so secur-

ing the head block, assuming the chain to be a good sound one, having no obvious defects and adequate for the work contemplated, the defendant is not liable for such negligence. It was said by Mr. Justice BEAN in *Mast* v. *Kern,* 34 Or. 247, 250 (54 Pac. 950, 951: 75 Am. St. Rep. 580) :

"The rule, and the one now unquestionably established and supported by the great weight of authority, both in this country and in England, is that the liability of the master depends upon the character of the act in the performance of which the injury arises, and not the grade or rank of the negligent employee. If the act is one pertaining to the duty the master owes to his servant, he is responsible for the manner of its performance, without regard to the rank of the servant or employee to whom it is entrusted; but, if it is one pertaining only to the duty of an operative, the employee performing it is a fellow servant with his co-laborers, whatever his rank, for whose negligence the master is not liable."

In *Baltimore & O. R. Co.* v. *Baugh,* 149 U. S. 368, 384 (13 Sup. Ct. 914, 920: 37 L. Ed. 772), Mr. Justice BREWER, in the opinion, in an exhaustive discussion of this question, said:

"*Prima facie,* all who enter into the employ of a single master are engaged in a common service, and are fellow servants, and some other line of demarcation than that of control must exist to destroy the relation of fellow servants. * * Of course, some places of work and some kinds of machinery are more dangerous than others, but that is something which inheres in the thing itself, which is a matter of necessity, and cannot be obviated. But within such limits the master who provides the place, the tools, and the machinery owes a positive duty to his employee in respect thereto. That positive duty does not go to the extent of a guaranty of safety, but it does require that reasonable precautions be taken to

secure safety, and it matters not to the employee by whom that safety is secured, or the reasonable precautions therefor taken. * * If the act is one done in the discharge of some positive duty of the master to the servant, then negligence in the act is the negligence of the master; but, if it be not one in the discharge of such positive duty, then there should be some personal wrong on the part of the employer before he is held liable therefor."

When the selection of materials or the adjustment or construction of appliances to suit them to the work in hand is such as is within the scope of the employment, and may be properly left to the workmen in their capacity as such, and is so left to them by the master, he is relieved from responsibility for their negligence, and whether a particular case falls within the duty of the master or that of the employee becomes a mixed question of law and fact, to be submitted to the jury as to the fact under legal rules; its determination depending upon the facts of the case. *Robinson* v. *Taku Fishing Co.*, 42 Or. 537 541 (71 Pac. 790) ; *Donnelly* v. *Granite Co.*, 90 Me. 110 (37 Atl. 874) ; *Great Northern Ry. Co.* v. *McLaughlin*, 70 Fed. 669 (17 C. C. A. 330). Defendant is liable for injuries occasioned by defects in the sling chain used to fasten the head block, if by inspection such defects are discernible, or if the master knew, or by the exercise of reasonable diligence ought to have known, thereof. *Bailey* v. *Cascade Timber Co.*, 32 Wash. 319 (73 Pac. 385) ; *Hall* v. *Marshutz & Cantrell*, 138 Cal. 522 (71 Pac. 692) ; *Fraser & Chalmers* v. *Collier*, 75 Ill. App. 194; *McNeill* v. *The Para* (D. C.), 56 Fed. 241. The knowledge of Church, the foreman, regarding the defective chain, and the manner in which the head block was attached, was the knowledge of his master, the defendant. *Rogers* v. *Portland Lumber Co.*, 54 Or. 387 (102 Pac. 601: 103 Pac. 514). From all the evidence in the case,

the jury could reasonably find that the act of Church in adjusting the head block, from its very nature, was the act of the company. 26 Cyc. 1325. Under certain circumstances, the adjustment of the block and tackle might be as much the duty of the defendant as the hanging of the shafting in the mill after its reconstruction. It was not necessarily, or as a matter of law, a part of the duty of Vanyi or his fellow laborers to furnish or adjust this instrumentality. It mattered not to him to whom the duty of securing the safety thereof was delegated, whether to Foreman Church, or to someone else. He had the right to look to his master to see that the place in which he was to work and the appliances with which he was to perform his duty were in a reasonably safe condition. If the alleged negligence of defendant had consisted in some act of Church, or the other employees, in the mere operation of the block and tackle, after the same had been safely secured, it would have been a different proposition.

There was no reversible error in overruling the motion for a nonsuit.

7. We have considered all the evidence in determining the motion for a nonsuit, for the reason that it is a well-settled rule in this State that although plaintiff, at the time of resting, may have failed to offer proof sufficient to entitle the cause to be submitted to the jury, a ruling denying such motion will not be disturbed, if the omission is supplied by the subsequent introduction of evidence. *Crosby* v. *Portland Ry. Co.,* 53 Or. 496 (100 Pac. 300: 101 Pac. 204) ; *Trickey* v. *Clark,* 50 Or. 516, 519 (93 Pac. 457).

Objection is made by counsel for defendant to certain instructions given by the court to the jury. These objections are based principally upon the want of evidence, a question which we have already considered.

From a careful perusal of the instructions taken as an entirety, we think the case was fairly submitted to the

jury, and that the instructions were as favorable to the defendants as could reasonably be expected. The jury found a verdict adverse to the defendant. There was testimony to support that verdict. Under the provisions of Section 3, Article VII, of the Constitution, it should not be disturbed.

Finding no prejudicial error in the record, the judgment of the lower court is affirmed.　　　AFFIRMED.