Argued July 10, affirmed September 15, rehearing denied November
10, 1914.

# BEAVER *v.* MASON, EHRMAN & CO.

### (143 Pac. 1000.)

**Appeal and Error—Review—Questions of Fact.**

1.   Under Article VII, Section 3, of the Constitution, providing that
in actions at law no fact tried by a jury shall be otherwise re-exam-
ined in any court unless the court can affirmatively say there is no
evidence to support the verdict, evidence to support the verdict must
be legal evidence, and must tend to prove every fact necessary to
make out a *prima facie* case for the party in whose favor the verdict
has been rendered.

**Master and Servant—Injuries to Servant—Actions—Questions for
Jury.**

2.   In an action for the death of a servant under 18 years of age,
evidence *held* to present a question for the jury whether defendant
permitted the minor to operate defendant's elevator.

> [As to warnings and instructions to minor employees, see notes
> in 43 Am. Rep. 269; 1 Am. St. Rep. 28; Ann. Cas. 1914A, 609.]

**Master and Servant—Injuries to Servant—Actions—Sufficiency of
Evidence.**

3.   In an action for the death of a servant, circumstantial evidence
*held* to tend to show that when decedent was getting into an elevator,
which was not equipped with any brake or appliances to prevent per-
sons on another floor from moving it up or down, he was caught in
some way and his chest crushed by the elevator.

> [As to liability of owner of elevator used by passengers or
> employees, see notes in 56 Am. St. Rep. 806; Ann. Cas. 1912D,
> 531.]

**Negligence—Elements—Violation of Statute—"Negligence Per Se."**

4.   When a statute forbids a thing to be done and makes the doing
thereof a misdemeanor, a violation of the statute is negligence *per se.*

> [As to employment of minor in violation of statute and negli-
> gence on part of the employer, see note in Ann. Cas. 1912B, 803.
> As to doctrine of contributory negligence and of assumption of
> risk in case of minor employed in violation of statute, see notes
> in Ann. Cas. 1912B, 803, 808; Ann. Cas. 1912D, 808.]

**Trial—Taking Case from Jury—Sufficiency of Evidence.**

5.   Where there is some legal evidence, though it be slight, to sus-
tain the issues on the part of plaintiff, the court must submit the case
to the jury.

**Appeal and Error—Review—Questions of Fact.**

6.   Though Article VII, Section 3, of the Constitution, provides
that no fact tried by a jury shall be otherwise re-examined unless the
court can affirmatively say there is no evidence to support the verdict,

yet when the verdict is not supported by legal evidence, the court must set it aside when properly asked to do so.

**Master and Servant—Injuries to Servant—Rules and Orders.**

7.  Under Laws of 1909, page 103, providing that no person or corporation shall employ or allow any person under the age of 18 to operate an elevator for persons or property, where an employer knew that a minor under 18 was operating an elevator, it was its duty to see that he ceased doing so, and to discharge him if he persisted.

**Pleading—Objections and Waiver—Pleading Over.**

8.  A motion to strike portions of the complaint is waived by the defendant answering and denying those portions.

**Appeal and Error—Review—Scope and Evidence—Order Denying New Trial.**

9.  An order denying a new trial is not appealable, and cannot be reviewed.

From Multnomah: DAVID R. PARKER, Judge.

This is an action by M. C. Beaver, administrator of the estate of Don Beaver, deceased, against Mason, Ehrman & Company, a corporation, to recover damages for injuries resulting in the death of plaintiff's intestate. From a verdict and judgment in the sum of $7,500, for plaintiff, defendant appeals. The facts are disclosed in the opinion of the court.

AFFIRMED.    REHEARING DENIED.

For appellant there was a brief over the names of *Mr. Thomas G. Greene* and *Messrs. Sheppard & Brock,* with oral arguments by *Mr. Greene* and *Mr. Robert J. Brock.*

For respondent there was a brief over the names of *Messrs. Schmitt & Schmitt* and *Mr. Oliver M. Hickey,* with oral arguments by *Mr. G. G. Schmitt* and *Mr. Hickey.*

Department 1. MR. JUSTICE RAMSEY delivered the opinion of the court.

The defendant is a corporation doing a wholesale grocery business in the City of Portland. Its place of

business was a seven-story building, and it employed a large number of persons in and about said building in carrying on its business. Don Beaver, a boy, was in the employ of the plaintiff on December 14, 1912, as a messenger boy, and was killed in one of the elevators of that building on that day. At the time of his death he was 17 years, 2 months and 4 days old. The plaintiff, his father, was appointed administrator of his estate, and brought this action for damages. The defendant used each of the seven floors of its building in carrying on its business. There were three elevators in the building, running from the basement to the seventh story, and used in transferring goods to and from different points in the building and in passing from one floor to another as the exigencies of the business required. One of these is called the city elevator, and in this elevator Don Beaver received the injuries that resulted in his death. The complaint alleges in part:

"That on or about the 14th day of December, 1912, in the aforesaid building, city, county and state, said Don Beaver, deceased, while performing his duty as office and errand boy, was instructed by the defendant and its agents, to perform a certain errand on the sixth and seventh floors of said building. That pursuant to said instructions said Don Beaver, deceased, ascended from the first to the sixth floor of said building in one of the said elevators used and operated by the defendant for the purpose of ascending and descending from one floor to another of said building, as aforesaid, and which was the same method pursued by said deceased on all former occasions while performing errands on said sixth and seventh floors, and the method pursued by all other employees in ascending and descending from the first floor to the sixth and seventh stories of said building, that being the usual course pursued by the defendant and all of its agents

and employees. That while said Don Beaver was either in the act of entering on the sixth floor to ascend to the seventh, or while in the act of leaving the elevator on the sixth floor, or while in the act of attempting to enter the elevator to descend from the sixth floor, the exact act being unknown to plaintiff, said deceased was caught in the railing used on the sixth floor as a gate to the elevator shaft, and said elevator was moved by someone, unknown to plaintiff, on another floor, in suddenly starting said elevator in operation in an ascending direction, causing said deceased to be carried with part of his body extending beyond the floor line of said elevator to the ceiling of the sixth floor, and there seriously crushing, bruising and injuring him about the head, shoulders, chest and body, from the effects of which he died a few hours thereafter.

"That the proximate cause of the death of said Don Beaver, caused by the wrongful, unlawful and negligent acts of the defendant in then and there allowing the said elevator, upon which said deceased was ascending, as aforesaid, to be operated, in that the same was then and there in an unsafe and dangerous condition, and particularly in that said elevator was not provided with a safety device so that persons using the elevator at any one floor could lock the operating cable to prevent the moving of the elevator by persons on another floor during the time the person in charge of the elevator leaves or enters the same, and in that said elevator was not provided with an automatic shut-off whereby said car could be stopped at any point between its foot and its highest landing, and in that the devices which were used on said car as a lock were out of order, in that said car could not be locked on every floor or on any of the floors on said building in its ascent or descent, and that the device used on said car as a shut-off was out of order, in that said elevator could not be stopped at its foot or any point to and including its highest landing, and, further, in that said elevator and elevator shaft was not provided with safe, proper and suitable framework, railing, automatic or self-closing gates; that said elevator, among other

things, was not provided with an automatic shut-off so that said car could be stopped at its foot and highest landing, and was not provided and equipped with an automatic trip or slack cable stop and an automatic brake of sufficient strength to hold the car at any point, and said elevator was not provided with a safety device by which persons using the elevator at one floor could lock the operating cable to prevent the moving of the elevator by persons on another floor, and said elevator and said elevator shaft was not protected with suitable framework or railing, and with automatic or self-closing gates, and all contrary and in violation of the laws of the State of Oregon, and all contrary and in violation of an ordinance of the City of Portland, county of Multnomah, State of Oregon, which ordinance is No. 21,455, entitled 'An ordinance regulating the construction, erection and enlargement, raising, alteration, repairing and use of building, and to provide for protection against fire, and provide a penalty for the same,' and particularly all of part 5 of said ordinance, including titles 1, 2 and 3, which ordinance was passed by the common council of said city on the 22d day of June, 1910, approved by the mayor of said city, Joseph Simon, on the 24th day of June, 1910, the same to take effect and be in force from and after January 1, 1911, and which said ordinance was in full force and effect on the 14th day of December, 1912.

"That the proximate cause of the death of said Don Beaver was further due to the wrongful, unlawful and negligent acts of the defendant in then and there allowing and permitting said deceased to operate said elevator, who was then of the age of 17 years, 1 month and 4 days, and contrary and in violation of the laws of the State of Oregon, and by the wrongful, unlawful and negligent acts of the defendant in allowing an elevator to be placed at the disposal and use of the said deceased, who was then of the age aforesaid.

"That the proximate cause of the death of said Don Beaver was further due to the wrongful, unlawful and negligent acts of the defendant in maintaining, permitting and allowing an elevator to be used by said de-

ceased which was then out of order and in a dangerous and unsafe condition without having warned and notified said deceased of the danger in connection therewith and by the wrongful, unlawful and negligent acts of the defendant in using, permitting to be used, and placing at the disposal for use a freight elevator for the use of conveying passengers, and by the wrongful, unlawful and negligent acts of the defendant in employing said deceased in a dangerous and unsafe place.''

The complaint also alleges damages in the sum of $7,500. The defendant's answer denies much of the complaint and sets up affirmative matter, including an allegation of assumption of risk by the decedent, and that the accident resulting in his death was due to his carelessness and negligence, etc. The most of the affirmative matter of the answer was denied by the reply. The trial resulted in a verdict and judgment for the plaintiff in the sum of $7,500. The defendant appeals.

When all of the plaintiff's evidence was in, the defendant filed a motion for a judgment of nonsuit for the following reasons: (1) That the evidence does not prove a cause of action in favor of the plaintiff and against the defendant; (2) that the proof does not show how or in what manner the said Don Beaver met his death; (3) that the proof does not show that any of the alleged acts of negligence charged against the defendant was the proximate cause of the death of said Don Beaver. This motion was denied.

After all the evidence had been submitted the defendant moved the court to instruct the jury to find a verdict for the defendant for the reasons set forth in said motion for a judgment of nonsuit. This motion, also, was denied. After the judgment was rendered, the de-

fendant moved for a new trial. This motion, also, was denied.

The defendant assigns the following errors only:

"(1) That the court erred in overruling appellant's motion to strike out certain portions of plaintiff's complaint; (2) That the court erred in overruling appellant's motion for a judgment of nonsuit; (3) that the court erred in overruling appellant's motion to direct a verdict after the evidence of plaintiff and defendant was in; (4) That the court erred in overruling the defendant's motion for a new trial; (5) that the court erred in rendering judgment in favor of the plaintiff and against the defendant."

The motions for nonsuit and for an instructed verdict for the defendant will be considered together. It will be noted that the plaintiff does not claim that there was any error of the trial court in the admission or the rejection of evidence, or in the instructions to the jury. In other words, the trial proceeded without any alleged error, except in overruling the motions for a nonsuit and for an instructed verdict.

1. Article VII, Section 3, of the Constitution provides, in part as follows:

"In actions at law, where the value in controversy shall exceed $20, the right of trial by jury shall be preserved, *and no fact tried by a jury shall be otherwise re-examined in any court of this state, unless the court can affirmatively say there is no evidence to support the verdict.*"

The trial having been conducted according to law and a verdict rendered, we are inhibited from re-examining the facts, unless we can say affirmatively that there is no evidence to support the verdict. Evidence to support the verdict must be legal evidence, and must tend to prove every fact necessary to make out a *prima*

*facie* case for the plaintiff or the party in whose favor the verdict has been rendered.

2. The evidence shows that the decedent, Don Beaver, received injuries on December 14, 1912, that caused his death, and that he was at that time a minor under 18 years of age; that about a month prior to his death he entered the employment of the defendant as messenger boy in its business, conducted in said building, and he worked for the defendant until he received the fatal injuries. He was paid $25 per month for his services. According to the evidence, he had not worked about elevators prior to the time that he entered the employment of the defendant.

C. A. Parks, office manager of the defendant, testified that he was acquainted with Don Beaver, and that when he entered the defendant's employment, the witness gave him the following instructions:

"I told him when I engaged him as an office boy that he was to be a sort of a messenger boy; that he would be required to go from one department to another, in fact, a general messenger boy through the house. We have a room on our sixth floor where we keep records, stationery and so forth, and all office boys are supposed to handle that work, but that at any time he was to take a trip to the sixth floor, *he was supposed to call one of the porters.* That is the definite instructions that I gave him."

This witness says that the foregoing is all the instructions that he gave him about the elevator.

It will be noticed that he was a general messenger and required to go from one department to another through the house. The house was the building referred to *supra,* having seven stories. All seven floors were used by the defendant in its business. This messenger boy was to go from department to department throughout this large building and do errands or carry

messages therein.   In this building the defendant had various departments and a different head for each department.

H. L. Rosenthal was in charge of the seventh floor. That is a fruit department.   Lola Kernan, a witness for the defendant, was employed in the office of the defendant on the day that Don was killed.   Just a few minutes before the accident, she told Don that Mr. Rosenthal, on the seventh floor, had some dates for her, and asked Don if he wanted to go and get them for her, and he answered in the affirmative.   Mr. Rosenthal testifies that he told Miss Kernan that there was a box of dates upstairs for her and to send someone up and he would send her the dates.   He says he sent them to her, and that she could give them to the rest.   Miss Kernan spoke to Don and asked him to go up to Rosenthal's department and get them for her.   He went as directed, and this trip resulted in his death.   Rosenthal says that Don went to the seventh floor on the elevator to get the dates, and obtained them, and that no one was with him, and that after he got the dates on the seventh floor, he went down to the sixth floor by the stairway.

Miss Flora Nelson, an employee of the defendant, testified that she saw Don six or seven minutes before 12 M., and only a few minutes before he was injured, on the sixth floor, and that he had come down the stairs from the seventh floor to see her, and, after talking to her a few minutes, she went up the stairway to the seventh floor, and that she saw him go toward the city elevator on the sixth floor.   No one saw him again until after he was hurt.

J. H. Wright, an employee of the defendant at the time of the accident, was on the seventh floor shortly before 12 o'clock M., and heard groans coming from

below. He was only a few feet from the elevator, and he went to the elevator shaft and leaned over and saw the feet and part of the legs, and finally saw the whole body, of Don on the sixth floor, lying with his face toward the elevator shaft and groaning. He got the elevator from below, and he and Mr. Rosenthal and a young lady descended to the sixth floor. He says that Don had in some way got 8 or 10 feet from the cage, and was reclining on a low box, with his head back on a stack of boxes, and he was breathing heavily. Mr. Wright asked him what was the trouble, how he got hurt, and Don answered:

"I got squeezed in the elevator. I thought I was on the seventh floor. Don't say anything; I will be all right pretty soon."

Others asked him questions and received substantially the same answers. He was taken downstairs, and while they were waiting for an ambulance to take him to St. Vincent's Hospital, he said, "I want to go to sleep; don't talk to me." What is stated *supra* is substantially all that he said about the accident. Others gave slightly different versions of what he said, but the substance of his statement is as stated *supra*. He was taken to the hospital.

Edwin W. Morse, M. D., was called to examine him after he arrived at the hospital, and the doctor testifies that he found him suffering from a crushing wound of the chest; that several ribs on his left side had been broken and driven into the lung; he was bleeding freely internally; respiration was very bad, and he died as a result of that injury in about an hour after the doctor first saw him. He says that the only external, visible sign of injury was the pressure on the left side of the chest, and that there was a depression there. The skin arose and fell with each respiration, showing that the

injury extended into the lung. The skin was not broken at all.

The witness J. H. Wright gave the following evidence tending to prove that Don was, as he had stated, "squeezed in the elevator":

"Q. What, if anything, did you observe relative to this gate right after the accident, * * the gate on the sixth floor?

"A. Right after accident. I don't know that I noticed it immediately after the accident, but that evening, some time during the evening, I noticed the gate; like the others, my curiosity was aroused to see whether it had been affected. Of course, I was wondering how it occurred. And the slats, one or two of them, were split on the end, showing a fresh split at the end. Any wood that is freshly broken will show, and they were fresh at the end. This split; I think it is split two or three times at one of these ends. I noticed that the gate had apparently got some kind of a jamb, to split the ends of the slats.

"Q. Did you notice anything wrong with the arm which automatically raised the gate?

"A. I didn't notice it that day; I didn't notice it until I saw Mr. Clark afterward have it in his hand to take it out.

"Q. How long after the accident was that?

"A. I don't remember whether it was that day or the next. It was after the accident; it wasn't immediately after; I don't remember; it could have been the day following, or the day after that possibly.

"Q. What was wrong with the arm?

"A. It was bent.

"Q. Now, what is this arm made out of?

"A. Iron.

"Q. About how thick is this iron?

"A. Well, I should think it was about half an inch, possibly a half inch or a little less, about a half inch in thickness, nearly two inches in width.

"Q. That is this arm?

"A. Yes.

"Q. And has on one end a pulley and the other end attached to the gate?

"A. Not exactly on the end. One end is longer than the other. That is to give it a swing to raise the gate.

"Q. You say that arm was taken off and straightened out?

"A. I don't know whether they straightened it out; they took it off, but whether they straightened that, or put on another, I don't know; but they had it off.

"Q. Did you observe anything in reference to that tin that crosses the space on top?

"A. I noticed this tin or sheet iron, or whatever it is, that is attached to the ceiling. It was bent upward, and it possibly looked like about the size of a man's body, that indentation.

"Q. Describe, as near as you can, the position that the body of this boy had when you first saw him, as you leaned over, looking down the shaft.

"A. Lying with his face toward the elevator, his feet a little nearer than the head, doubled up a little, with his face toward the elevator and his head to the east; his feet to the west, and his face toward the elevator, with his head a little nearer to the east side—he was to the east side of the elevator as he laid.

"Q. How far was his body, or any part of his body from the edge of the elevator shaft?

"A. Oh, about 18 or 20 inches, something like that."

The evidence showed that there were no brakes or shut-offs or lock or appliance of any kind that would cause the elevator to stop at any floor, and that persons using it stopped it by taking hold of the cable. The evidence tended to prove that the elevator was not equipped with appliances as required by ordinance No. 21,455 of the City of Portland, which is as follows:

"All freight and passenger elevators (except hand power), shall be provided with an automatic down speed governor or regulator, except worm-gear elevators, the speed of which is less than sixty feet per minute.

"Every power elevator shall be provided with an automatic shut-off, which shall stop it at its foot and highest landing. Such elevators shall also have slack cable devices.

"All freight elevators shall be provided with a safety device, by which persons using the elevator on one floor can lock the operating cable to prevent the moving of the elevator by persons on another floor during loading or unloading.

"All freight elevator shafts and hoistways in any building, not inclosed, shall be protected on each and all floors of any such building with suitable framework or railing, not less than five feet high, and all approaches and entrances to any such elevator shaft and hoistways shall be provided with automatic or self-closing gates; and no person shall use, permit or cause to be used, any such freight elevator, shafts or hoistways in any building unless the same is protected or inclosed as above required."

The evidence tends to show, and it is not disputed, that over the door of the elevator in question on the first floor of the building there was printed the following notice: "Nobody Allowed to Use the Elevator, Except Employees"—and that the defendant had no one employed specially to operate the elevators. The evidence tended to show that employees about the building used the elevators when they had occasion to go from one floor to another.

J. H. Wright testifies that the elevator was accessible to anyone, and that he had seen Don operate the elevator alone a few times.

G. F. Wright testifies that employees operated the elevator if they wanted to do so, and that it did not require much strength to operate it. He says that he saw Don operate it alone several times.

H. L. Rosenthal says he saw Don three or four times operating the elevator, and that he thinks he was alone

when doing so. This witness says that he saw Don and another boy, a few days before the accident, come up the elevator, and the elevator reversed and started back, and Don jumped off when the elevator was about a foot below the floor and that he told him to quit that business, as the elevator was not a plaything, and he was liable to be killed.

Florence Nelson, an employee of the defendant, testifies that she had seen Don use the elevator several times.

Edward Ehrman, president of the defendant, says that he told Don about a week before he was killed to get away from the elevator, and that he had no business there.

The evidence shows that Don had worked for the defendant only about a month. During this time four witnesses had each seen him operating the elevator alone several times.

Mr. Parks, who employed him for the defendant, and gave him his instructions as to the manner of performing his duties, says that he instructed him that when he was to go to the sixth floor he was *supposed to call one of the porters* (Evidence, p. 112), and that was all the instructions that he gave him with reference to the elevator. He did not tell Don that they could not permit a boy of his age to operate the elevator, or that it was dangerous for a boy to do it. All that he says that he told him was that, when he had to make a trip to the sixth floor, he should call one of the porters. He did not say that Don should not operate the elevator, or for what purpose he was to call a porter, or what the porter was expected to do, if called.

We hold that there was sufficient evidence before the jury to require the court to submit to the jury the

73 Or.—4

question whether the defendant did or did not allow Don to operate the elevator. Under the evidence, it was a proper question for the determination of the jury, as it is shown that he did operate it frequently, and the defendant's officers may have had knowledge thereof and acquiesced therein. Under the issues and the evidence, it was for the jury, and not the court, to determine that question. We cannot say that there was no evidence to support the contention that they *allowed* him to operate it.

3. The evidence shows that just before the accident, Rosenthal, in charge of the fruit department on the seventh floor, informed Miss Kernan, an employee in the office, that he had in his department a box of dates for her, and asked her to send someone up to get it. She asked Don if he would obtain it for her, and he agreed to do so, and ascended to the seventh floor, operating the elevator himself. He there obtained the box of dates and walked down the stairs to the sixth floor to see another person. In a few moments, after seeing the person on the sixth floor, he went to the elevator on the sixth floor, with the intention, doubtless, to descend to the floor where Miss Kernan was to deliver to her the dates. In a few moments, persons on the seventh floor heard groans coming up the elevator, and looking down the shaft, Mr. J. H. Wright saw Don lying on the sixth floor near the elevator shaft. He and others descended to the sixth floor and found Don there. He had managed to crawl a few feet from the elevator shaft. When asked by Wright how the accident occurred, he said that he "got squeezed" in the elevator. *The dates were in his pocket.* The doctor who examined him a little later testifies that his left breast was crushed and that several ribs on his

left side were broken and driven into his left lung, but the skin was nowhere broken.

The evidence of Mr. Wright quoted *supra* tends to show that probably when he was getting into the elevator on the sixth floor to descend, he was, in some way, caught and his chest crushed thereby. The elevator evidently caught and ''squeezed'' him as he stated. The elevator was not equipped with any brake or appliance by which persons operating it could lock it or the operating cable so as to prevent persons, on another floor, from moving the elevator up or down. It was not equipped with an automatic shut-off or other appliance whereby the elevator car could be stopped at any point between its first and highest landing. Hence it was possible, when anyone was in the act of getting on or off the elevator car, for someone, on another floor, to move the car up or down and thereby ''squeeze'' or crush the person so getting on or off the car.

We think that there was circumstantial evidence tending to prove that Don was ''squeezed'' and crushed in that manner. It was not necessary to establish said fact by positive proof. Any fact in this case could be established by circumstantial evidence. We hold that there was evidence tending to prove that Don was ''squeezed'' and crushed in the elevator when he was getting in the car to descend to the floor where Miss Kernan was, to deliver the box of dates to her, and that he was pursuing his duties as messenger boy for the defendant when he was injured. The order to go and get the dates and deliver them to Miss Kernan originated with Mr. Rosenthal, who had charge of the fruit department on the seventh floor, and it was communicated to Don by Miss Kernan, who worked in

the defendant's office.   Don was justified in obeying the order as a part of the duties of his employment.

We have given a summary of the facts which the evidence tended to prove.

4.  The legislative assembly in 1909 passed an act "to limit the age of employees in elevators": Laws 1909, p. 103.   The first section of this act is as follows:

*"That no person,* firm *or corporation shall employ or allow any person under the age of eighteen* (18) *years to run, operate,* or have charge of, any *elevator used for the purpose of carrying either persons or property."*

The second section of said act makes a violation of the first section thereof a misdemeanor.   This act was passed in part for the protection of minors under 18 years of age.

When the legislative assembly passes a statute forbidding a stated thing to be done and making the doing thereof a misdemeanor, a violation of such statute constitutes negligence *per se:* 1 Thompson's Commentaries, Negligence, § 10; *Peterson* v. *Standard Oil Co.,* 55 Or. 522 (106 Pac. 337, Ann. Cas. 1912A, 625); *Goodwin* v. *Rowe,* 67 Or. 1 (135 Pac. 171); *American Car & Foundry Co.* v. *Armentraut,* 214 Ill. 509 (73 N. E. 766); *Bromberg* v. *Evans Laundry Co.,* 134 Iowa, 38 (111 N. W. 417, 13 Ann. Cas. 33); *Woolf* v. *Nauman Co.,* 128 Iowa, 261 (103 N. W. 785); *Nairn* v. *National Biscuit Co.,* 120 Mo. App. 144 (96 S. W. 679); *Sterling* v. *Union Carbide Co.,* 142 Mich. 284 (105 N. W. 755); 1 Bailey, Personal Injuries (2 ed.), Section 349.

Thompson, in his Commentaries on Negligence, Volume 1, Section 10, says:

"This seems to introduce in this place a consideration of the antithesis of the proposition contained in

the preceding paragraph—the case where the legislature of the state, or the council of a municipal corporation, having in view the promotion of the safety of the public, or of individual members of the public, commands or forbids the doing of a particular act.   Here the general conception of the courts, and the only one that is reconcilable with reason, is that the failure to do the act commanded, or the doing of the act prohibited, is negligence *per se;* and this irrespective of all questions of the exercise of prudence, diligence, care or skill, so that if it is the proximate cause of hurt or damage to another, and if that is without contributory fault, the case is decided in his favor, and all that remains to be done is to assess his damages.''

In *Peterson* v. *Standard Oil Co.,* 55 Or. 522   (106 Pac. 337, Ann. Cas. 1912A, 625), the court says:

''The complaint in this case alleges facts that constitute a violation of this statute, and we think that such violation constitutes negligence *per se.''*

In  Bailey, Personal Injuries (2 ed.), Section 349, the author says:

''In most of the states, but not in all, the employment of a child under the statutory age is negligence *per se,* and in some of the states the employer cannot set up against the injured employee the defenses of assumed risk or contributory negligence.''

In *Sterling* v. *Union Carbide Co.,* 142 Mich. 284 (105 N. W. 755), the syllabus is in part:

''Under Act No. 113 (Pub. Acts 1901, § 3), the employment of a child under 16 years of age to operate a machine dangerous to life or limb, whereby he is injured, constitutes actionable negligence.''

In *Iron & Wire Co.* v. *Green,* 108 Tenn. 164 (65 S. W. 399), the syllabus is in part:

''Employment of an infant in violation of statute forbidding such employment and making it a misde-

meanor constitutes *per se* such negligence as makes the employer liable for all injuries sustained by the infant in the course of his employment.''

5. Where there is some legal evidence, though it be slight, to sustain the issues on the part of the plaintiff, the trial court must submit the case to the jury: *Perkins* v. *McCullough,* 36 Or. 146 (59 Pac. 182); *Galvin* v. *Brown & McCabe,* 53 Or. 598 (101 Pac. 671); *Manning* v. *Portland S. B. Co.,* 52 Or. 101 (96 Pac. 545); *Elliff* v. *Oregon R. & N. Co.,* 53 Or. 66 (99 Pac. 76); *Vanyi* v. *Portland F. M. Co.,* 63 Or. 520 (128 Pac. 830); *Devroe* v. *Portland Ry., Light & Power Co.,* 64 Or. 547 (131 Pac. 304).

6. The court cannot constitutionally re-examine the evidence and set aside the verdict, unless it can say affirmatively that there is no evidence to support it.

The provision of the Constitution, referred to, is a standing inhibition to this and other courts against overturning verdicts where there is any legal evidence to support them. However, when they are not supported by legal evidence, it is incumbent on courts to set them aside, when properly asked to do so : *Sullivan* v. *Wakefield,* 65 Or. 528 (133 Pac. 641); *Nelson* v. *St. Helens Timber Co.,* 66 Or. 570 (133 Pac. 1167, 135 Pac. 169); *Devroe* v. *Portland Ry., Light & Power Co.,* 64 Or. 547 (131 Pac. 304).

7. The evidence showed that the boy Don was under 18 years of age at the time of the injury, and it strongly tended to show that he was injured in the defendant's elevator as stated in the complaint. There was also sufficient evidence to be submitted to the jury, tending to show that, when he was hurt, he was pursuing the duties assigned to him as messenger boy for the defendant, and that he was allowed by the defendant to operate the elevator. The evidence tended strongly

to show that he frequently used the elevator in performing his duties as messenger, and the circumstances are such that it was the duty of the court below to submit that question to the jury. If the defendant knew that he was operating the elevator, it was its duty to see that he ceased doing so, and to discharge him if he persisted in operating it. Several witnesses testified that they each had seen him operating it a number of times, and hence we say that the evidence tends to show that he did so frequently. He was there only about a month.

Mr. Ehrman, president of the defendant, says that he saw him trying to use the elevator once and told him that he had no business there and to get away. The defendant could act only through its officers and agents. The evidence shows that it had several officers and agents besides Mr. Ehrman. The other agents of the defendant may have known of Don's using the elevator and may have allowed him to do it. The agents of the defendant who had control of its business ought to have known what he was doing. The jury could, under the evidence, properly find that the defendant knew of his operating it and permitted him to do so if they believed from the evidence such to be the fact.

Under the evidence, the questions as to the assumption of risk and contributory negligence were properly submitted to the jury. We do not find it to be necessary to examine all the questions that the ability and industry of counsel have enabled them to present.

8, 9. The motion to strike out portions of the complaint was *waived* by the defendant's answering and denying those parts thereof. The order of the trial court denying the motion for a new trial is not an appealable order, and hence we cannot review it.

We conclude that the motions for a judgment of nonsuit and for a directed verdict for the defendant were properly overruled. We find no error in the record.

The judgment of the court below is affirmed.

                    AFFIRMED.    REHEARING DENIED.

MR. JUSTICE BEAN and MR. JUSTICE MOORE concur.

MR. JUSTICE BURNETT delivered the following dissenting opinion:

The only evidence in the record on the subject of the defendant allowing the decedent, Don Beaver, to operate the elevator, or that the company had notice that he was doing so, is found in the testimony of the president, the office manager, and Rosenthal, an employee. Ehrman, the president, says that about a week before the accident he told the boy to get away from the elevator, and that he had no business there. The manager stated that when he employed the deceased he told Don that he was supposed to call a porter when he wished to make a trip to the sixth floor. Whatever this may mean, it certainly does not signify a permission to the boy to run the elevator, especially alone. Rosenthal saw Don and another boy operating the elevator when the deceased jumped out after the car had passed a foot beyond the floor level, whereupon Rosenthal told him to quit that business, as the elevator was not a plaything and he was liable to be killed. We are left to mere conjecture for anything indicating that the deceased was allowed to run the elevator, or that anyone having authority in the defendant's establishment knew that he ever meddled with it. All the legitimate testimony on that point is

that he was directed to keep away from it. All that appears is that a sad death has occurred, but the mere happening of an accident does not create a cause of action. The boy's death was clearly the result of his own disobedience without defendant's knowledge, so far as the record shows, and in the face of ample warning. The defendant ought not to be amerced in damages in the interest of those who would speculate and get gain out of his unfortunate death.

I dissent from the conclusion of Mr. Justice RAMSEY.