Argued January 15, affirmed February 19, 1929.

MARY M. BAKER, *v.* STATE INDUSTRIAL ACCIDENT COMMISSION.

(274 Pac. 905.)

For appellant there was a brief over the name of *Mr. I. H. Van Winkle,* Attorney General, with an oral argument by *Mr. Miles H. McKey,* Assistant Attorney General.

For respondent there was a brief and oral argument by *Mr. E. R. Ringo.*

BEAN, J.—The defendant, State Industrial Commission appealed from a judgment, based upon the verdict of a jury, in favor of Mary M. Baker, claimant and widow of Frank O. Baker, who died July 16, 1926.

It is conceded in this case that on April 17, 1926, Baker, and his employer, the Coates Driving and Boom Company, a corporation, were under the Workmen's Compensation Act. The company was engaged in logging and lumbering operations in Tilla-

mook County. On that date Baker, in the course of his employment, while performing his duty as an employee, undertook to make a coupling between a locomotive engine and a car loaded with logs belonging to the company. While he was thus engaged in coupling the car to the engine he was caught by a log that extended beyond the end of the car, and as he did so, his shoulders and chest were severely crushed between the end of the engine and the end of the log and his left clavicle fractured.

The defendant immediately caused Baker to be placed in a hospital under the care of Dr. R. T. Boals, a physician authorized by the defendant, where he remained as a patient until his death. After he was received at the hospital Dr. Boals caused an anesthetic to be administered and reduced the fracture. The bone was splintered and the surgeon gathered it together the best he could, but on June 21st he found it was necessary to again administer an anesthetic for the purpose of performing an operation to remove a supposed callous around the nerve.

Baker suffered a great deal of pain from the time of the injury and gradually lost weight and strength. A few days prior to his death he developed a gastric obstruction in the stomach. To relieve that condition a third operation was performed under a general anesthetic by Dr. Boals on July 16, 1926, and it was found that Baker was suffering from a cancerous condition of the lower part of the stomach, but that the stomach was not closed and that it would not have caused the death of Baker for some time, or until he would starve. Baker failed to survive the operation.

It is alleged in the complaint that the condition which prompted the operation of July 16, 1926, was not such as to cause an immediate or sudden death

and was not the cause of the death of Frank O. Baker, but that his death resulted from the accident and injury afterward, and the operations performed and anesthesias administered as a result thereof, which caused his physical condition and the lowered general resistance which resulted from the accident, and injury and the operations performed and the anesthesias administered as a result thereof. This allegation is denied by the defendant.

It is the contention of defendant that the accidental injury of April 17, 1926, was not the proximate cause of Baker's death; that on the other hand his death was due to an independent intervening cause. The plaintiff maintains the contrary and that if it had not been for the accidental injury of April 17, 1926, which arose out of and in the course of the employment of Baker (which is not questioned), that he would not have died on July 16th of that year; that had it not been for the accidental injury mentioned, which lessened the vitality and resistance of Baker and weakened him, and the operations which were necessarily performed, and the anesthesias that were necessarily administered as a necessary result of the accidental injury, Baker would have survived the last operation.

The testimony of Mary M. Baker is to the effect, that Frank O. Baker was a man sixty years of age, of good physical condition, weighing about 186 pounds, was strong and rugged at the time of the accident, and had been so for several years. He was actively engaged in work and at times being required to go about in the timber, and was never under the doctor's care, to her knowledge prior to the injury. That after the injury he was taken to the hospital;

was under the care of Dr. Boals; that his weight went down to about 135 pounds; that he suffered internally all the time; could not read or sit up nor use his left arm. That the second operation was to correct the condition and relieve pain; that the doctor tried to build him up for the third operation; that he had worked every day for years, doing active physical labor; that the last few years preceding his death he had been acting as fire-warden during the shut-down.

Hal Bohnenkamp testified, to the effect, that he had known Baker for twenty-one years; that he was in good health, an active, big husky fellow; that he saw him after the injury July 1st and 3d, 1926; he was then in bad condition. He was in pain and was run down.

Mrs. Blanche L. Calverley testified, in substance, that she had known Mr. Baker about a year and a half; that he was quite a large rugged man, engaged in work calculated to promote good health and physical development; that from the date of his injury his suffering was intense.

Dr. Shuster testified to the effect, referring to the operation of July 16, 1926, that a majority of men of good health, strong men, "could easily withstand an operation of that kind; that in a majority of cases it was not such as would cause death in a person otherwise well."

Dr. R. L. Benson, physician and inspector in the University of Oregon Medical School, and who had been professor of pathology in that school about fourteen years, testified that he had performed a *post-mortem* examination upon the body of Frank O. Baker about July 17, 1926, and stated in detail that he found, among other things, a "cancer of the pyloric

end of the stomach, and evidence of a recent unhealed operation; a prominent and roughening of the left clavicle bone"; that the operation was apparently properly performed; that it was a fairly common operation.

To the question:

"Well, Doctor, what I am trying to find out, is whether or not it was the operation itself that caused death, eliminating his other physical conditions resulting from this injury and his weakened condition growing out of that, assuming that he was as well as he was the day he received the injury should the operation not be a success?

A. If he was well and strong with no physical disabilities and were subjected to an operation like that, and taking a simple case, the risk would be extremely small in the hands of a skillful operator—the risk to life would be so small I should say it wouldn't, with that type of strong individual, wouldn't reach one per cent; *of course, when we have any disabilities there, when we have some of the conditions that we found here, the risk would be* greater and it would be a little difficult to say.

"Q. *To what conditions do you refer there,* Doctor?

"A. *Cancer of the stomach would, of course, reduce his vitality* to a considerable extent; the *disease of* the *coronary arteries* of the heart would probably reduce his resistance to a degree although this wasn't an extreme hardening of these arteries that I found, it was very moderate and ordinarily doesn't cause death, although it is given as one of the causes of death in the regular lists of causes of death. So, of course, the risk to life in an operation of this kind depends upon the various abnormal conditions that are in the body. *This man with the cancer of the stomach and even a moderate hardening of the arteries of the heart wouldn't of course be as good a risk as a man who hadn't these disabilities.*

"Q. But even under that condition he would and should withstand an operation of that kind, should he not, if he was otherwise healthy?

"A. They usually do, yes."

Dr. Benson further testified, in effect, that administering the general anesthetic would produce a depletion of the central nervous system; that intense pain over a period of say, three months would probably lower his resistance. That there was no way of telling how long the cancerous condition had existed, except that it was not a thing that grows very rapidly; that it was probably a matter of several months. That as a rule cancer does not cause death until it becomes general. That the cancerous condition which he described, or the progress of it, was not such as to cause him to believe that Baker died from cancer by itself, or that it would have resulted in his immediate death; and the fact that he was suffering intense pain, after the operation for gastro-enterostomy and the operation resulted unsuccessfully; *that the original injury and the fact that he was suffering intense pain as outlined, would have to be considered as a contributing factor,* just to what extent, he could not say. That the cancerous condition was a little over three inches in length, of the lower end of the stomach, a thickening of the wall in the region of the cancer. The whole part of the region was not affected. It went around perhaps two thirds of the way.

Upon a cross-examination Dr. Benson, referring to finding the cause of death in an autopsy in answer to the question "you didn't find a cause," stated, in part, as follows: "In answer to the one as to finding a cause, I did find not only a cause but several causes here" (meaning causes of death).

The testimony on the part of plaintiff undoubtedly tends to show that the accidental injury to Baker arising out of and in the course of his employment was the contributory proximate cause of his death. The question was fairly and ably submitted to the jury by the charge of the learned trial judge. For brevity's sake we quote portions of Judge Bagley's instruction to the jury, thus:

"The claimant asserts that the injury thus sustained produced the death of Mr. Baker. The defendant Commission insists that the death was due to surgical shock following an operation rendered necessary by a cancerous condition of Baker's stomach and is in no way attributable directly or indirectly to the injury sustained in his employment on April 17th, 1926. The contention of claimant is that, though death was immediately due perhaps to shock or cancer of the stomach, it was superinduced by a weakened and lessened vitality or lowered vitality of Baker caused by the injury sustained in his employment."

" * * *

"There can be no allowance of compensation for a death caused by agencies independent of an injury received in the employment in which Baker was employed, so that there is just one primary important question for your determination: What was the proximate cause of the death of Frank O. Baker."

" * * *

"There must be no other independent, efficient cause to break the connection between the original injury and the death, although, of course, there may be factors following, assisting or contributing to the original cause, the natural train set in motion by the original injury."

" * * *

"If the death of Baker at the time was the result of the lowered general resistance of Baker following and caused by the accidental injury, that is, but for

such injury and the train of consequences directly set in motion thereby, he, Baker would not have died when he did, the injury by accident in his employment may be considered the proximate cause of death; but, if his death would have occurred at the time it did occur by reason of the operation upon his stomach notwithstanding the accidental injury he received in his employment and the lowered resistance, if any, by reason thereof, then the proximate cause would be a new one independent of the original injury and the train of events set in motion thereby."

The testimony of Dr. Boals, a witness for the defense, was, as a conclusion or opinion, that Baker's death was caused by a "surgical shock, following an operation for cancer of the stomach." Dr. Boals further testified to the effect that if it had not been for the operation (on July 16, 1926) Baker would probably have lived two years. Dr. Boals made out a death certificate that the cause of Baker's death was "cancer of the stomach; contributory, fracture of clavicle." He also testified that "the physical condition of the patient has a great deal to do with it."

We have then, in the present case, an accidental injury coming within the provision of the Workmen's Compensation Law, where the evidence tends to show that the death of the patient was caused, at least in part, by the injury which he received and the resulting necessary treatment.

1. Where the testimony discloses that there are two causes which may have resulted in the death of the workman, it is for the jury to determine which of those causes was the proximate cause of his death. In this case the jury found that Baker's death was proximately caused by the injury which he received. That had it not been for the injury and his lowered resistance and impaired vitality, directly

caused by the injury, he would not have died at the time he did.

The case in principle is much like that of *Robertson* v. *State Industrial Accident Commission*, 114 Or. 394 (235 Pac. 684). In a carefully considered opinion by Mr. Justice Brown we find at page 399 the testimony of the claimant's attending physician which was not disputed, showing that Robertson had on his right leg over his right shin bone, a lesion—an infected abrasion, showing an inflammation about three or four inches above and below this lesion, and that he had considerable pain and fever, for which he was treated. "There was pneumonia and pleurisy development afterwards." His attending physician testified as an expert, "that in his opinion pleurisy and pneumonia resulted because of the lowered resisting power of the patient."

This testimony was not controverted. At page 403, we find the following language:

"In the case before us, was the pneumonia caused by the accidental injury received by Robertson in the course of his employment by Stockton Brothers? Had we been the trier of facts, it is possible that we might have decided this issue in favor of the Commission. However, the jury found in favor of the claimant. It is not our province to weigh the evidence. But it is our duty to determine whether this finding is supported by some competent evidence."

It was held that according to the testimony there was some evidence of "causal connection between the accident and the disability for which compensation was claimed."

In the case of *Woods* v. *Wilson*, 8 Butterworth W. C. C., page 288, a coal heaver with appendicitis received a blow in the stomach while coaling a vessel.

Operation four days later for appendicitis; death three days later from peritonitis; caused from perforation of bowels occurring after operation. The trial judge found that the accident caused an acute injury to the weakened bowel and the injury so caused gradually produced perforation of the bowel and so accelerated death. The finding was reversed by the court of appeal. The dependent appealed to the House of Lords. At page 297 we find the following language: (In reversing the judgment of the court of appeal)

"Questions arising under this act are apt to introduce what Lord MACNAGHTEN once called 'the endless perplexities of causation,' which I wish to avoid. But certain propositions are, I think, now settled. A court of law has no jurisdiction to set aside an award upon a finding of fact, if there is any evidence to support the finding, however much the court may disagree with the finding. And it is enough to bring the case within the act if *injury by accident in any material degree accelerated the death.*" (Italics ours.)

To much the same effect see *Stool* v. *Southern Pac. Co.,* 88 Or. 350 (172 Pac. 101).

In *Dunnigan* v. *Cavan and Lind,* 4 Butterworth W. C. C., page 386, a workman who was engaged in laying a drain-pipe was struck on the back by a stone and was injured. A day or two afterward he was seen by a doctor who diagnosed pneumonia and sent him to a hospital, where he remained for three days, when he insisted on being taken home. He was accordingly assisted home by some neighbors, a distance of some ten minutes' walk. This was in spite of the warning of the doctor that such a course was dangerous to life. He died two days afterward. In an application by his widow for compensation it was

found that death resulted from the accident. At page 388 we find the following language of the LORD PRESIDENT:

"We cannot tell with certainty what would have happened had the man not left his bed at the time when he did; we cannot say absolutely either that he would have died or that he would have recovered. But still we have got to determine as a matter of common sense whether the death was due to the accident which brought on the pneumonia or to the man's own foolish action subsequently."

It was held that there was evidence which justified the finding.

The law is stated in Corpus Juris W. C. A. pamphlet, page 69 et seq.:

"Acceleration of a diseased bodily condition may constitute a personal injury, and an injury may be by accident, although it would not have been sustained by a perfectly healthy individual. So death may be regarded as having been caused by an injury, although there was a diseased condition prior to the injury without which death would not have ensued, and partial or total incapacity may spring from, and be attributable to, the injury, where undeveloped and dangerous physical conditions are set in motion producing such a result. * * *" See Madden's Case, 222 Mass. 487, 489, 497 (111 N. E. 379, L. R. A. 1916D, p. 1000).

Where an employee suffered a broken leg and an attack of delirium tremens developed when the secondary shock set in, the proximate cause of death ensuing was the injury, notwithstanding his system had been so weakened by his intemperate habits as to be unable to withstand its effects: *Ramlow* v. *Moon Ice Co.,* 192 Mich. 505 (158 N. W. 1027, L. R. A. 1916F, 955.)

2, 3. In determining whether the physical harm sustained by the employee was the consequence of the accident or the injury, the controlling question is the continuity of the chain of causation and the absence of any intervening independent agency; the inquiry as to whether the result is the natural and probable one is immaterial: C. J., W. C. A., p. 70, § 60.

In *Anderson* v. *Industrial Ins. Com. of Wash.*, 116 Wash. 421 (199 Pac. 747), cited and quoted from in *Robertson* v. *State Ind. Acc. Com.*, *supra*, a workman received a cut in his foot from an ax. The wound was dressed and later in the day, at his request, he was taken home, twelve miles distant, in the cold, walking a mile of the way. Two days later he developed a case of pneumonia, from the effects of which he died. The medical witnesses testified that the ax wound would not of itself have caused pneumonia. All agreed that the wound and the resultant weakened condition of the workman rendered him much more susceptible to the disease, than he otherwise would have been; that it was not beyond probability that he acquired pneumonia from exposure, because of his weakened condition. The court said at page 402 of the report:

"There is, of course, no question of contributory negligence or fault involved. * * Nor is it necessary that the ax wound should have been of itself the cause of the death. It is sufficient if it was the proximate cause—the cause which directly set in motion the train of events which brought about the death."

4. In the present case the testimony indicated a causal connection between the accident and the death for which compensation is claimed. *Robertson* v. *State Ind. Acc. Com.*, *supra*, p. 404 of 114 Or. Where there are different factors which contribute to the

death of such a workman, it is the province of the jury to determine which factor is the cause of his death: *Miami Quarry Co.* v. *Seaborg Packing Co.,* 103 Or. 362, 370 (204 Pac. 492).

5. Where there is a conflict in the evidence, or where reasonable minds might draw different conclusions from the testimony, and the jury makes a conclusion, it is a well-settled rule that the court has no right to disturb the verdict: *Vanyi* v. *Portland F. M. Co.,* 63 Or. 520, 530 (128 Pac. 830).

In the case of *Elliff* v. *Oregon R. & N. Co.,* 53 Or. 66, 76 (99 Pac. 76, 80), the court said:

"Whether or not the injury to the plaintiff would have happened but for the negligence of the defendant in failing to warn him, is problematical, and in cases of doubt as to which of several probable causes produced a hurt, the case should be submitted to the jury for their determination of the question."

Section 6626, Or. L., as amended by Chapter 311, General Laws of Oregon, 1921, page 572, provides:

"If any workman while he is subject to this act and in the service of an employer who is thus bound to contribute to the industrial accident fund shall sustain a personal injury by accident arising out of and in the course of his employment caused by violent or external means, he or his beneficiaries or dependents, if the injury result in death, shall receive compensation according to the following schedule. * * *"

We do not find the words "proximate cause" or "contributory cause" in the statute. It seems to have been the legislative intent to avoid as far as possible, technical terms. All the provisions of the act are to be liberally construed: Or. L., § 6641. In construing the statute we should not "lug in at one

door what the legislature industriously put out at another.'' 1 Honnold W. C., p. 487, § 127.

If a workman while subject to the act, is in the service of an employer who is also subject to the act, and sustains a personal injury by accident arising out of and in the course of his employment, caused by violent or external means, he or his beneficiaries, or dependents, if the injury result in death, should receive compensation as provided in the act.

6. By ''proximate cause'' or ''probable cause'' is not meant the last act or cause or nearest act to the injury, but such act as actually aided in producing the result as a direct and existing cause. It need not be the sole cause, but it must be a concurring cause: *Brown* v. *Oregon-Washington R. & N. Co.*, 63 Or. 396, 403 (128 Pac. 38).

In the case at bar the testimony of lay witnesses, that of Mrs. Baker, and acquaintances of Baker, and also that of expert witnesses, the physicians and surgeons who testified, strongly tended to show that accidental injury which Baker received on April 17, 1926, at least, actually aided in producing his death, as a direct and existing cause. Certainly no stricter rule would be applied in the present case than in the case for a personal injury caused by negligence last above cited.

7. The fact that the cancerous condition of Baker contributed in a measure to his death does not defeat compensation where the injury received by him under the circumstances detailed resulted in his death: *Foley* v. *Pioneer Min. & Mfg. Co.*, 144 Ala. 178 (40 South. 273).

8. It cannot be assumed as a matter of law that Baker's injuries did not hasten death by impairing his strength and vitality and lessening his ability to

resist the diseased cancerous condition and the consequent operation: *Louisville & N. R. Co.* v. *Jones,* 83 Ala. 376 (3 So. 902, 9 Am. Neg. Cas. 5).

In *Jones* v. *Caldwell,* 20 Idaho, 5 (116 Pac. 110, 48 L. R. A. (N. S.) 119), the syllabus at page 121 reads thus:

"If the latent condition itself did not cause pain, suffering, etc., to the patient, but such condition plus the accident caused such pain, the fall, and not the condition, is the proximate cause of the injury."

We quote from the note to that case at page 127 as follows:

"As said in *Herke* v. *St. Louis & S. F. R. Co.,* 141 Mo. App. 613 (125 S. W. 822):
'It is manifest that a plea that one was afflicted with a disease which would sooner or later end his life would not be a defense to taking such life by an act of negligence. He, and those depending upon him, are entitled to have his life, though hanging by a thread, extended without interruption by the wrongful act of another.'
In a proceeding under the English Workmen's Compensation act, the fact that a man who died from a heart stroke was by physical debility more likely than others to suffer in such a manner can have nothing to do with the question whether the heat stroke is to be regarded as an accident or not. *Ismay* v. *Williamson* (1908), A. C. 437 (77 L. J. P. C. N. S. 107, 99 L. T. N. S. 595, 24 Times L. R. 881, 52 Sol. Jo. 713).'"

To the same effect see case cited in 5 Labatt's M. S., p. 5417, in which the vitality of a workman afflicted with nephritis was lowered and his death accelerated by accident.

9. The jury was not required to disregard the testimony of the other witnesses tending to show that Baker's death resulted from the injury caused by the

accident and decide the case on the opinion of Dr. Boals, especially as Dr. Boals' certificate of death showed that the injury was a contributory cause of his death.

10, 11. We think the charge to the jury by Judge BAGLEY was correct and fairly submitted the case to them. The testimony was sufficient to take the case to the jury.

The judgment should be affirmed.    AFFIRMED.

COSHOW, C. J., and BELT, J., concur.

The defendant, State Industrial Accident Commission, has appealed from a judgment in favor of Mary M. Baker, claimant and widow of Frank O. Baker, who died July 16, 1926. The appeal is grounded upon the alleged error of the lower court in denying defendant's motion for a directed verdict, and in the matter of instructions.

BROWN, J., Dissenting.—On April 17, 1926, Baker was in the employ of the Coates Driving & Boom Company, a corporation engaged in logging and lumbering operations in Tillamook County, Oregon, both employer and employee being subject to the provisions of the Workmen's Compensation Act. On that date, in the course of his employment, and in performing his duty as an employee, he undertook to make a coupling between a locomotive engine operated by the company and a car loaded with logs and belonging to the company. While he was engaged in coupling the loaded car to the engine, he was caught by a log that extended beyond the end of the car, and suffered a fracture of the left clavicle. The defendant immediately caused him to be placed in a hospital at Tillamook and under the care of Dr. R. G. Boals, a phy-

sician and surgeon employed by defendant, where he remained as a patient until his death. After Baker was received at the hospital the attending surgeon caused an anesthetic to be administered and reduced the fracture, and, on June 21st, he again administered an anesthetic, for the purpose of making a correction in the reduction. During this time, the patient had considerable trouble with his stomach, suffered loss of appetite, became unable to retain food to any extent, and gradually lost in weight and strength. Finally, in an effort to determine what was wrong, X-ray pictures of the stomach were taken. These pictures revealed an almost complete gastric obstruction. To relieve that condition, a third operation was performed by Dr. Boals, whereupon it was discovered that Baker was suffering from cancer of the stomach. He failed to survive the operation.

The defendant asserts that the proximate cause of Baker's death was the cancer, while the plaintiff insists that it resulted from the personal injury sustained by Baker on April 17, 1926.

Concerning the injury, and the treatment administered to Baker at the hospital, Dr. Boals testified:

"He was brought to my hospital on the 17th of April, with a fracture of the left clavicle which reached the left collar bone, and with some injury around the left shoulder and the side of the chest. * * I reduced the fracture to the clavicle. It was splintered * * and it was hard to make it hold together * * . He had more or less pain over the brachial plexus or nerve and down the median nerve of the forearm. * * He had more or less disturbance during all this period of time, inability to eat * * , experienced a good deal of sour stomach. * * Some time in July I examined his stomach; took X-ray pictures of the stomach * * . We found that he had

quite an obstruction in the * * lower end of the stomach, * * and it prevented the food from going down through into the intestines, and * * he vomited quite a bit * * . On the 16th day of July, we did an operation to find out the exact condition in his stomach and primarily to relieve the obstruction to the passage of food which the X-ray showed. We found out after we had opened up his stomach that he had a cancer of the stomach, pyloric end of the stomach, and it was pretty near impossible to determine as to where the food went to in the intestine. * * The man's general condition on the table was very bad, so we did the most probable thing that would give him relief. We united the most dependent portion of the stomach * * to the small intestine. * * We had to give him all kinds of stimulants on the table. We had to use artificial respiration, and he died twenty minutes after we put him to bed.

"Q. What was the cause of death? A. Surgical shock following an operation for cancer of the stomach.

"* *

"Q. There were no bad effects from the anaesthetic in these first two cases? A. No, sir, there wasn't."

The doctor testified that without the operation the cancer would have caused death within three or four weeks, but that if the patient had survived the operation he probably would have lived a year.

Mary M. Baker, plaintiff, testified that prior to the accident her husband was healthy and strong; that he "never was under a doctor's care in his life to my knowledge, only when he was hurt." But, on cross-examination, she admitted that Baker had had a hernia for a number of years prior to that time, and that about a year and a half before he died he had been compelled to submit to an operation for relief. After further questioning concerning the hernias, she said, "I think he had two; one on each side."

Dr. E. J. Shuster, produced by the plaintiff as an expert witness, testified that "an ordinary fractured clavicle doesn't amount to much." As to the effect of an anesthetic, he stated that the administering of an anesthetic results in a depression of the central nervous system, with loss of sensation; that it produces temporary paralysis; and that two general anesthetics in a period of two months and four days, together with continual suffering and pain on the part of the patient during that period, would tend to lower his general resistance.

Dr. R. L. Benson, Professor of Pathology in the University of Oregon Medical School, who performed a *post-mortem* upon the body of Baker the day following his death, testified:

"I found cancer of the pyloric end of the stomach. * * There was the evidence of a very recent operation * * . There was some little hardening * * of the small arteries that supply the heart * * . There was a prominent and roughening of the left clavicle bone."

Concerning the dangers of an operation of the character of that performed upon the body of Baker by Dr. Boals, this witness testified:

"If he (the patient) was well and strong, with no physical disabilities, and were subjected to an operation like that, and taking a simple case, the risk would be extremely small in the hands of a skillful operator—the risk to life would be so small I should say it wouldn't, with that type of strong individual, wouldn't reach one per cent. Of course when we have any disabilities there, when we have some of the conditions that we found here, the risk would be greater, and it would be a little difficult to say.

"Q. To what conditions do you refer there, Doctor? A. Cancer of the stomach would, of course, reduce

his vitality to a considerable extent. The disease of the coronary arteries of the heart would probably reduce his resistance to a degree.''

When asked whether there was any way of telling how long the cancerous condition had existed, he answered:

''No, there is no way of telling how long, except that it is not a thing that grows very rapidly. That is, it was probably a matter of several months.''

The claimant in the cause at issue seems to rely upon the case of *Robertson* v. *State Industrial Accident Commission*, 114 Or. 394 (235 Pac. 684), where it was held that, under the Workmen's Compensation Act, recovery for occupational or general diseases is allowable only where such disease is traceable to accidental personal injuries arising out of and in the course of the workman's employment. In that case Robertson, the workman and claimant, suffered an accidental personal injury to his body, which, on account of the lowered resisting power of the patient, resulted in pneumonia; and this court, in discussing the law under consideration, said:

''Before the State Industrial Accident Commission is empowered to compensate a claimant by reason of pneumonia, such disease must be traceable to an accidental personal injury arising from and in the course of his employment. It may be said in general that disease arising in the course of employment is not within the embrace of the compensatory provisions of the act. However, if the disease arises from an accidental personal injury received in the course of his employment in a hazardous occupation, as defined by the law, such disease does come within the embrace of the Compensation Act.

''In the case of *Iwanicki* v. *State Industrial Accident Commission*, 104 Or. 650 (205 Pac. 990, [29

A. L. R. 682]), this court, speaking through Mr. Chief Justice BURNETT, said, at page 664:

" 'No one disputes that if an accident happens within the true meaning of the term, which brings on a subsequent disease, the ailment must be counted as part of the injury, but the initiative must be found in the suddenness and unexpectedness of what is termed "accident." ' "

From a careful analysis of the record in the instant case, we have been unable to find any evidence that tends to trace the cancer to the injury. In fact, a thorough study of the testimony of the plaintiff's own witnesses strongly indicates that there existed no relation whatsoever between the two. Moreover, this conclusion is strengthened by the testimony of Dr. Boals, the attending physician and surgeon, who, on cross-examination by counsel for plaintiff, testified:

"Q. Isn't it a fact, Doctor, that a cancer is frequently retarded and the growth is so slow that one goes along for considerable time before death? A. We are talking about cancer of the stomach now.

"Q. Yes, cancer of the stomach? A. Cancer of the stomach is sometimes—yes, it goes along quite a while, and after you get cancer developed to the point where you have practically a complete occlusion of the pylorus, then it has already so well developed that metastasis (distribution of cancerous cells to other cells of the body) is just a short way off; and the rule of averages is that they live about a year or a year and a half, if they have a successful gastroenterostomy without a resection of the diseased area."

Now, taking up the case as it relates to the aggravation of previously impaired condition, we note the following from "A Corpus Juris Treatise, Workmen's Compensation Acts, Kiser:"

"Acceleration of a diseased bodily condition may constitute a personal injury, and an injury may be by

accident, although it would not have been sustained by a perfectly healthy individual. So death may be regarded as having been caused by an injury, although there was a diseased condition prior to the injury without which death would not have ensued.''

The editor then goes on to say that acceleration of such diseased condition ''to the point where it constitutes a personal injury by reason of the strain or exertion of the employment constitutes an injury arising out of the employment.''

An interesting case on this subject is that of *In re Madden*, 222 Mass. 487 (111 N. E. 379, L. R. A. 1916D, 1000), where the Supreme Court of Massachusetts, in a studied opinion, said:

''The essential connecting link of direct causal connection between the personal injury and the employment must be established before the act becomes operative. The personal injury must be the result of the employment and flow from it as the inducing proximate cause. * * It is only when there is a direct causal connection between the exertion of the employment and the injury that an award of compensation can be made. The substantial question is whether the diseased condition was the cause, or whether the employment was a proximate contributing cause. In the former case no award can be made; in the latter, it ought to be made.''

From the record in this case, it is apparent that Frank O. Baker died from surgical shock arising out of an operation performed upon his body for the removal of an obstruction to the passage of food from his stomach to the small intestine. It fails to show any connection between the broken clavicle and the cancerous condition of the workman's stomach. Furthermore, from proved facts we are firmly convinced that the continuous weakening of the patient during

all the weeks after he was received at the hospital, and extending to the day of his death, resulted, not from the operation in setting the broken clavicle, but from the disease which was daily ravaging his system. During this time, the cancer was slowly but surely sapping the vitality of the patient. It likewise grew in proportions until, at the time of his death, it had almost completely obstructed the passage of food from the stomach into the intestines, thus rendering it impossible for the stomach to function. The patient also suffered from a general disturbance of the stomach, which finally caused a rejection of food. Hence the gradual wasting away of the patient, with the accompanying loss of strength. As substantially stated by one of plaintiff's witnesses, the fracture of the clavicle amounted to but little; and the record is utterly void of testimony tending to show that the fracture aggravated the malignant disease that was preying upon the body of Frank O. Baker.

In his opinion, Mr. Justice Bean lays stress upon the fact that Dr. Boals, the attending physician, made a death certificate stating that Baker died of "cancer of the stomach; contributory, fracture of clavicle." In view of this fact, and to make clear the apparent discrepancy between the death certificate and the testimony of the attending physician, the writer deems the following fitting and pertinent: Mr. Bohnenkamp, the mortician in charge of the body of Baker, was the son-in-law of the deceased. According to the undisputed testimony, he called upon the attending physician with reference to the execution of the death certificate, and at that time a heated argument ensued, the basis thereof being clearly indicated by this excerpt from the physician's testimony:

"I made that statement under these conditions: Mr. Bohnenkamp came to my office and insisted that the fracture of the clavicle was the cause of this gentleman's death. I told him it wasn't, and he argued the question with me for two hours; and in order to get rid of him I inserted that fracture of the clavicle at his request; it wasn't my opinion at all.

"Q. That wasn't the cause of his death, then? A. The cause of his death was, as I stated, cancer of the stomach, shock due to cancer of the stomach.

"Q. He didn't have anything to do with you stating it was cancer of the stomach, did he? A. He didn't want me to put that cancer of the stomach in there.

"Q. But you didn't put it in there under his suggestion? A. No, I put that in there under my own suggestion.

"Q. Because at that time that was your opinion? A. Yes, sir, and it is my opinion now. But he wanted me to put in that fracture of the clavicle—he says, 'We have talked this matter over with Dr. Benson, and we can recover compensation if we can show any relationship between the two.' After he talked to me about two hours—I couldn't get rid of him—I put that fracture of the clavicle in there to ease his peace of mind.

"Q. Although you knew it was false? A. I didn't believe it.

"Q. You stated that when you didn't believe it to be true? A. Well, sometimes you have to do things you don't want to. It is the only way I could get him out of the office. He was very discourteous after we talked it over for two hours.

"Q. You would rather state something in the matter of record that you knew to be false or believed to be false than to be discourteous to Mr. Bohnenkamp? A. It was because he insisted on the thing being put in there; I knew I could later on prove it wasn't so if it had to be, that it was put in there. There was other witnesses to the transaction besides myself. * * I told him it didn't make any difference how much

argument he used, that I would always say he died of cancer of the stomach.''

The writer is impressed with the candor of this witness.

To carry out the beneficent purposes of the Workmen's Compensation Law, a liberal interpretation and construction of its several sections is required. See Or. L., § 6641. However, the Industrial Accident Commission, charged with the administration of the statute involved, after a full and complete hearing, denied the claim of plaintiff for compensation. The Commission is composed of men trained to glean the facts of cases coming to their notice, and these men, after a thorough investigation, were unable to find that Baker sustained personal injuries by accident arising out of and in the course of his employment, *resulting in death.*

Based upon the statute above noted, it is the opinion of the writer that the judgment rendered in the court below should be reversed.