Argued September 13, 1966, affirmed February 1, 1967

# KINNEY *v.* STATE INDUSTRIAL ACCI-
# DENT COMMISSION

423 P. 2d 186

*Harold W. Adams,* Assistant Attorney General, Salem, argued the cause for appellant. With him on the briefs were Robert Y. Thornton, Attorney General, and Wallace Carpenter, Assistant Attorney General, Salem.

*Bernard Jolles,* Portland, argued the cause for respondent. With him on the brief were Franklin, Olsen, Bennett & DesBrisay, Portland.

Before McALLISTER, Chief Justice, and SLOAN, GOODWIN, HOLMAN and LUSK, Justices.

LUSK, J.

This is an appeal by the defendant State Industrial Accident Commission (now the Workmen's Compensation Board: ORS 656.002 (3)) from a judgment of the circuit court on an appeal from the order of the Commission denying plaintiff's claim for compensation. In a jury trial, after the plaintiff had rested and the defendant, without introducing any evidence, also rested, both sides moved for a directed verdict. The jury was thereupon discharged and the court found that the plaintiff had sustained a compensable injury and entered an order referring the case back to the Commission for the fixing of the plaintiff's compensation.

The only substantial question for decision is whether the plaintiff suffered an "injury" within the meaning of that word as used in the Workmen's Compensation Law.

Plaintiff at the time of the incident involved was employed as a maintenance man by a firm known as Plastics Northwest. He was 51 years of age. On June 2, 1963, an elevator in the building where plaintiff was working fell into the pit and a fellow employee who

was in the elevator was injured. Plaintiff undertook to assist him. He tried to move a safety gate weighing 150 to 175 pounds which was wedged in the elevator, but was unable to do so. He then went to the second floor of the building, got a ladder and put it up to the elevator spool that hangs on the ceiling with the purpose of respooling and raising the elevator. He climbed to the top of the ladder, but was forced to come down because he experienced shortness of breath, dizziness, and pressure on his chest. He was taken to Holladay Park Hospital. The hospital record shows the following diagnosis: "Acute anterior myocardial ischemia due to coronary artery disease—probable arteriosclerotic basis. Aortic and mitral stenosis due to rheumatic fever, childhood. Hypertensive cardiovascular disease."

Plaintiff was discharged from the Holladay Park Hospital on June 14, 1963, but did not return to work.

On July 8, 1963, the plaintiff suffered an early morning onset of shortness of breath and pressure upon his chest. He was taken to the Veterans Administration Hospital in Portland and treated there for aortic stenosis. He remained in the hospital until August 13, 1963, and thereafter was treated as an outpatient until September 10, when he was readmitted and on October 22, 1963, it was determined that surgery was indicated. On February 10, 1965, open heart surgery was performed at the University of Oregon Medical School Hospital and the plaintiff was fitted with a Starr-Edwards stainless steel prosthetic valve, replacing his own aortic valve which had been narrowed as a result of aortic stenosis.

The only medical witness was Dr. Leonard W. Ritzmann, Professor of Medicine at the University of

Oregon Medical School and head of the cardiology section of the Veterans Administration Hospital in Portland. Dr. Ritzmann supervised treatment of the plaintiff after he entered the Veterans Hospital.

In explaining the anatomy and physiology of the heart Dr. Ritzmann testified that the left ventricle is "a pumping chamber over the rest of the body" and the "outlet of the left ventricle is into the aorta, the main blood vessel, which leads blood to all the rest of the body."

The plaintiff had a heart condition, he testified, known as aortic stenosis, by which is meant a narrowing or shrinking of the aorta. The result "of aortic stenosis on the heart muscle is predominantly to increase the workload and the way the heart compensates for this is for the heart muscle to get thicker and stronger" and due to the narrowing of the aortic valve there is a "type of pressure difference which we call an aortic systolic type of contraction pressure grading" which enables a physician to make a certain diagnosis of the presence of stenosis. A patient may have this type of deformity for many years and have no symptoms. He may

"* * * have been completely active, maybe even been very active in terms of sports and the like, even though they have the condition. Somewhere along the line a patient then usually will develop some type of symptoms from this disease, however, the symptoms which we mentioned, and it is at the time that symptoms develop that we feel it is necessary to step in with a form of therapy, because the condition is really a serious one, once the symptoms have developed, leading very commonly to death within several years."

The symptoms are often the same as those of severe coronary artery disease, that is, angina pectoris or

heart pain, shortness of breath, and fainting or dizziness. In aortic stenosis angina results because "the heart itself is now thickened and * * * the blood supply to the heart is no longer able to keep up with feeding the extra amount of muscle." The witness thus explained the reason why stress produces symptoms in a patient having aortic stenosis:

"Well, when stress occurs, this puts an extra workload on the left ventricle to produce blood for the rest of the body which uses an increased amount of oxygen and requires extra oxygen to be transported by the vascular system. The heart itself has to supply this and hence when the heart is trying to put out this extra load, if it is unable to receive enough blood supply itself in order to take care of this extra work, this is the place where symptoms of angina occur."

Respecting the cause of the plaintiff's symptoms he testified:

"My opinion is that the unusual stress that he underwent in trying to raise this elevator and the other tenseness of the situation, the extra work that he went through at that time, was the precipitating factor for his first symptoms associated with his aortic stenosis."

He testified, in effect, that where there are no symptoms aortic stenosis is not disabling. When symptoms appear, it becomes disabling. In order to determine whether there was coronary artery disease he and other doctors examined all the electrocardiograms which were available and made other tests. The results were negative. It was admitted by counsel for the plaintiff on the trial that there was no myocardial infarction.

The statute in effect at the time this case arose provided that a workman who sustains "an accidental

injury &ast; &ast; &ast; arising out of and in the course of his employment" is entitled to compensation as provided in other sections of the Act: former ORS 656.152. The statute contains no definition of injury. The defendant contends that it means "a lesion or pathological change in a tissue or organ of the human body," and that, since there is no evidence of such a change, there was no compensable injury. In the statutes of a few of the states injury is defined in accordance with the defendant's contention,[1] and there is some judicial authority for that view in states having no statutory definition of the word: *Bohanan v. Schlozman Ford, Inc.,* 188 Kan 795, 366 P2d 28; *Burns's Case,* 218 Mass 8, 105 NE 601, Ann Cas 1916A 787; *Sullivan's Case,* 265 Mass 497, 164 NE 457, 62 ALR 1458. The New York cases, though inconclusive, appear to lean towards the side of the physical damage rule: *Matter of Goldman v. White & Case,* 9 AD2d 160, 193 NYS2d 100, affirmed 9 NY2d 763, 215 NYS2d 71, 174 NE2d 744; *Matter of Chernin v. Progress Serv. Co.,* 9 AD2d 170, 192 NYS2d 758, affirmed 9 NY2d 880, 216 NYS2d 697, 175 NE2d 827; *Straws v. Fail,* 17 AD2d 998, 233 NYS2d 893. (See the criticism of the New York cases in 1A Larson's Workmen's Compensation Law, § 42.23, pp. 622.175-622.177.)

Generally, injury is defined as "[a]ny wrong or damage done to another, either in his person, rights, reputation, or property": Black's Law Dictionary (4th ed). While our statute no longer speaks of "personal

---

[1] For example, Texas Revised Civil Statutes Annotated, Article 8306, § 20, which reads:

"Wherever the terms 'injury' or 'personal injury' are used in the Workmen's Compensation Law of this state, such terms shall be construed to mean damage or harm to the physical structure of the body and such diseases or infection as naturally result therefrom. &ast; &ast; &ast;"

injury" it is, of course, only personal injuries that it deals with. The term is to be given a broad and liberal construction in view of the remedial and humanitarian purposes of the Workmen's Compensation Law: *Newell v. Taylor et al,* 212 Or .522, 527-528, 321 P2d 294. Only "accidental" injuries are compensable, and, since the amendment of 1957[2] defining the term, accidental injury may include both the cause and the effect: *Olson v. SIAC,* 222 Or 407, 352 P2d 1096.

Some indication of the correct approach to interpretation of the word injury in a compensation law may be found in *San Francisco v. Industrial Acc. Com.,* 183 Cal 273, 191 P 26, where the court held that a constitutional provision authorizing legislation to "create and enforce a liability on the part of all employers to compensate their employees for any injury incurred by [their] employees" etc., authorized the inclusion by the legislature in California's Workmen's Compensation Act of a provision for the awarding of compensation for death by disease. In stating the question the court said:

> "The word 'injury' as so used means, of course, only bodily injury, and the position of the city is that it means only bodily injury suffered by or resulting from violence, while the position of the commission is that it covers any harmful effect upon the body, whether by violence or by disease." 183 Cal at 275.

The court's decision sustained the position of the commission.

The question presented is of first impression in this state and seems to have been seldom raised else-

---

[2] "An injury is accidental if the result is an accident, whether or not due to accidental means." ORS 656.002 (19).

where. But, with the possible exception of *Matter of Goldman,* supra, upon which the defendant relies, no case has been cited from a state which has no statutory definition of injury, nor has any been found, which supports the defendant's position. The Oregon cases claimed by defendant to implicity determine the question in its favor[9] in our opinion do not. It is true that in all of them there was evidence of damage to the physical structure of the body and compensation was awarded, but the question before us was not involved in any of them and there is not the slightest intimation as to how it should be decided.

*Morse's Case,* 345 Mass 776, 189 NE2d 530, cited by the defendant, is the only case we have seen involving aortic stenosis. There, as here, open heart surgery had to be resorted to, but there was evidence of permanent heart damage caused by an accident, and, so the case is not in point.

Several Oklahoma cases cited by the plaintiff appear, as counsel for defendant concede, to support plaintiff's position, since compensation awards were approved in the absence, so far as the opinions disclose, of evidence of pathological change: *Co-operative*

---

[9] The cases cited, together with their factual situations as stated in the defendant's brief, are the following: Armstrong v. SIAC, 146 Or 569, 31 P2d 186 (Basic injury, the fall of automobile wheels on back and neck and shoulders of claimant. Disease, heart condition; ultimate injury, myocardial infarction.); Elford v. SIAC, 141 Or 284, 17 P2d 568 (Basic injury, rupture of the pre-existing cancer in the process of lifting.); Huntley v. SIAC, 138 Or 184, 6 P2d 209 (Basic injury, the rubbing of the leather of a heavy shoe and the abrasion of the heel of claimant. Disease causally related, blood poisoning.); Baker v. SIAC, 128 Or 369, 274 P 905 (Basic injury, the fracture of the left clavicle. Disease, cancer of the stomach.); Robertson v. SIAC, 114 Or 394, 235 P 684 (Basic injury to the leg with eventual pneumonia resulting in hospitalization for that injury.). Of like kind are Holub v. SIAC, 241 Or 187, 405 P2d 356, and Heuchert v. SIAC, 168 Or 74, 121 P2d 453.

*Publishing Company v. Jestes* (Okla) 373 P2d 33; *Truck and Trailer Sales and Service v. Davis* (Okla) 372 P2d 612; *Calhoun Construction Company v. Sexton* (Okla) 288 P2d 705; *Acme Material Company v. Wheeler* (Okla) 278 P2d 234. These are all cases of strain aggravating a pre-existing diseased condition. Nearer the mark is *Hastings v. City of Fort Lauderdale Fire Dept.* (Fla) 178 S2d 106, in which the question was stated to be:

"What should a Deputy Commissioner do when there is competent, substantial evidence presented to him to the effect that the deceased employee died as the result of 'ventricular fibrillation' or 'arrhythmia' super induced by unusual physical and mental stress and strain not common to his routine duties, rather than a *myocardial infarction* * * *?" (Italics added.) 178 S2d at 108.

The words we have italicized indicate there was no heart damage, but compensation was nevertheless awarded. See Larson, op. cit. § 38.73, p. 622.14, where it is said: "Of course, there are some heart deaths, due to heart stoppage or fibrillation, in which a post mortem may show no definite structural change, * * *." And in *Monk v. Charcoal Iron Co.,* 246 Mich 193, 224 NW 354, where a workman, who had a previous heart disease, was exposed to shock and excitement, which the medical testimony showed brought on "acute dilation of the heart" resulting in his death, the court held that "the commission was justified in finding that the decedent suffered an accidental personal injury arising out of and in the course of his employment, and that such injury was a contributing cause of his death." 246 Mich at 196-197. A similar case is *Geltman v. Reliable Linen & Supply Co.,* 128 NJL 443, 25 A2d 894, 139 ALR 1465. A workman was assaulted

when on his master's business and died. In sustaining compensation the court said:

> "In the case at hand, the cause of death was a fibrillation and impairment of the blood circulation of the heart—an acute anoxemia of the heart—due to emotional and nervous shock attending the assault; and this is no less a 'personal injury by accident' than if it had ensued from physical impact. (Citation omitted.) The physiological injury is as certain and definite in the one case as in the other; and the design of the statute plainly is to render compensation for the disability flowing from an accident having the prescribed relation to the employment. Vide Sigley v. Marathon Razor Blade Co. 111 NJL 25." 128 NJL at 446.

We come now to the consideration of a class of cases not referred to in argument, but which we think cannot be dismissed as without relevance. These are "nervous injury" cases discussed at length in Volume 1A of Larson's work. He classifies these cases into three groups, namely, mental stimulus causing physical injury, physical trauma causing nervous injury, and mental stimulus causing nervous injury: § 42.20. We are concerned here with only the third group, as in the other two "there is something," to quote Larson, "to satisfy the old-fashioned legal insistence upon something 'physical' ": § 42.23, p. 622.171.

Although there is a split in the authorities, there are numerous cases (Larson says "a distinct majority": § 42.23, p. 622.171) supporting compensability in the class of cases in the third group. In *Burlington Mills v. Hagood,* 177 Va 204, 13 SE2d 291, compensation was awarded to a female employee who suffered a disabling traumatic neurosis when a loose wire in a nearby electric motor caused a short circuit which pro-

duced an electric flash and a sound resembling that of a shotgun. The court said:

"Although there is a conflict on the question, the majority of the reported cases take the view that there is an accidental or personal injury within the workmen's compensation acts where an employee, in the course of his employment, receives a sudden shock or fright, involving no physical impact, which results in his disability." 177 Va at 209-210.

The court recognized the common law rule followed in Virginia (as it is in Oregon: *Rostad v. Portland Ry. etc. Co.,* 101 Or 569, 581, 201 P 184), that there can be no recovery for mental anguish unaccompanied by physical injury, but continued:

"* * * The rules of the common law for tort actions, however, do not apply to cases under the Workmen's Compensation Act. Under the Workmen's Compensation Act, the proceeding is not one for damage for a wrong done, but to obtain compensation for a loss sustained by reason of disability. Virginia Code 1936, section 1887, subsections 29, *et seq.* The Compensation Act is intended to be remedial and must be liberally construed in favor of the employee. * * *" 177 Va at 210.

The court concluded:

"As a result of the accident and injury Mrs. Hagood was incapacitated for work. Her incapacity was as effectual as if it had been caused by visible lesion." 177 Va at 211.

The Texas court, notwithstanding the statute defining "injury" above quoted, reached a similar result in a case where the plaintiff, an iron worker, sustained a disabling neurosis as the result of seeing a coworker fall to his death when one end of a scaffold on which they were standing gave way: *Bailey v. American Gen-*

*eral Ins. Co.,* 154 Tex 430, 279 SW2d 315 (two judges dissenting). The court said:

> "The phrase 'physical structure of the body,' as it is used in the statute, must refer to the *entire* body, not simply to the skeletal structure or to the circulatory system or to the digestive system. It refers to the whole, to the complex of perfectly integrated and interdependent bones, tissues and organs which function together by means of electrical, chemical and mechanical processes in a living, breathing functioning individual. To determine what is meant by 'physical structure of the body,' the structure should be considered that of a living person—not as a static, inanimate thing." 154 Tex at 436.

As to the language of the statute requiring damage or harm to the physical structure of the body, the court observed that all the testimony shows "that plaintiff's body no longer functions properly" and that " '[h]arm' with reference to a living, active structure—as the body is—in fact means essentially that the structure no longer functions as it should." 154 Tex at 436.

> In the dissenting opinion it was said:

> "It might well be held that the failure or inability of the body to function properly constitutes damage or harm to the body, but the Act requires, not simply damage or harm to the body, but damage or harm to the physical structure of the body." 154 Tex at 445.

In view of the language of the Texas statute one might well agree with the dissent, but, nevertheless, much of the reasoning of the majority opinion is entirely acceptable in a state where "injury" is left undefined by statute and particularly in a case not fraught with the difficulties inherent in meeting fraudulent claims of psychiatric disorders. In the case at bar the testi-

mony of Dr. Ritzmann was not only not contradicted, he was not even cross-examined, and there can be no doubt on the record before us that the disability of the plaintiff did not occur in the normal progress of the disease of stenosis, but was directly caused by his unusual exertion. Similar cases to those just reviewed are *Carter v. General Motors Corp.,* 361 Mich 577, 106 NW2d 105; and *Klein v. Len H. Darling Co.,* 217 Mich 485, 187 NW 400.

So far as these nervous injury cases bear upon the question of the meaning of the word "injury" we see no significant difference between them and a case of aggravation of an aortic stenosis involving no pathological change.

■ We are concerned here with a man in apparent normal health, able at least to hold down a job, who suddenly, as the result of unusual exertion in the course of his employment, is stricken and is never thereafter able to work. He did not have a "heart attack" which, as Dr. Ritzmann testified, involves "destruction of the heart muscle," but he exhibited the symptoms of a heart attack, precipitated by the stress of exertion, was disabled, and eventually was required to undergo open heart surgery and now lives with an artificial aortic valve. Had he suffered a coronary occlusion with the same results he would, without question, have been entitled to compensation: *Olson v. SIAC,* supra; but the Commission says that, because nothing has happened to him except that his heart has ceased to function properly, there has been no injury and should be no compensation.

We do not agree. The Legislature has not seen fit to define the word "injury" and the courts are left with a clear choice between two possible meanings. It

seems to us to be our plain duty to adopt the meaning which more nearly accords with the purpose intended to be served by the Workmen's Compensation Law, and we therefore hold that the plaintiff suffered an accidental injury arising out of and in the course of his employment and is entitled to compensation.

Other questions raised by the defendant are, we believe, sufficiently covered by what has already been said.

The judgment is affirmed.